## BRADY *v.* IRBY.

### Opinion delivered January 8, 1912.

1. GIFT—VALIDITY AS TO CREDITORS.—A gift is valid as to creditors if the donor owed no debts at the time the gift was made, or if after such gift he retained property amply sufficient to pay all debts then existing against him. (Page 578.)

2. SAME—PRESUMPTION OF FRAUD.—A gift of property by one in debt is presumptively fraudulent as to creditors then existing; and if the debtor is, at the time of such gift, insolvent, or if the gift is of such amount or made under such circumstances that it will hinder, delay or defraud creditors, it is conclusively fraudulent. (Page 579.)

3. PLEDGE—OF CORPORATE STOCK—EFFECT.—Dividends upon corporate stock declared while such stock is pledged to a creditor of the stockholder belong to such creditor, and all persons having notice of such pledge will be affected thereby. (Page 579.)

Appeal from Lawrence Chancery Court; *George T. Humphries,* Chancellor; affirmed.

*J. B. Judkins, W. E. Beloate* and *John B. McCaleb,* for appellants.

This case hinges on the intention of Brady at the time he had the stock transferred to Mrs. Brady, and whether he was solvent at the time, or such transfer of stock would render him so.

The evidence shows that at all times until the Marcur judgment he considered himself solvent; the reason for having the stock issued to his wife is shown, and there is no evidence whatever of an intent to defraud.

To render a transfer voidable, the fact that the conveyance was voluntary, while that may be a strong indication of fraudulent intent, of itself is not sufficient. The intent to hinder, delay or defraud creditors must exist at the time of the transfer, and this intent will not be inferred by presumptions, but must be proved by evidence legitimately tending to show its existence. Pomeroy's Eq. Jur. § § 969, 970, 972.

If Brady believed, as appears by the evidence, that he was retaining many times the amount of his debts, and the only creditors interested knew and acquiesced in his transferring the stock, it was a valid transaction. 96 Ark. 531; 34 Ark. 451.

If a conveyance is not fraudulent when made, it can not become fraudulent and void as against creditors by any fraudulent intent existing either before or after that time, or by prior or subsequent conduct of the parties, or by other separate or distinct transactions, prior or subsequent, which were fraudulent. 20 Cyc. 413; 18 Ark. 172; *Id.* 123; 48 N. W. (Mich.) 573; 15 Fed. 541. See also on the question of conveyances from husband to wife, 134 U. S. 405; 20 Cyc. 603; 9 Am. St. Rep. 697; 8 Ark. 470; *Id.* 84; 74 Ark. 161, 165; 29 Ark. 407; 55 Ark. 116; 56 Ark. 253; 75 Ark. 127; 101 U. S. 731; 8 Wheat. 229.

*H. L. Ponder,* for appellee.

1. The allegations of the appellant's answer are sufficient to stamp the conveyance as a voluntary one and without sufficient consideration. Neither the services of a wife to a husband, nor savings from money given to her by him, nor earnings when they belong to him, are a sufficient considerationn. 20 Cyc. 524; 59 Am. St. Rep. 243; 45 Am. St. Rep. 160; 14 S. W. 84. While, in a conveyance upon consideration, fraudulent

-intent must be proved as a distinct fact, this is not the rule in a voluntary conveyance, for in the latter case the very absence of a consideration may of itself establish the intent.   14 Am. & Eng. Enc. of L. (2 ed.) 242.

A voluntary conveyance by a debtor who was in fact insolvent is void as against creditors, even though he had no actual intent to defraud.   76 Ark. 513.   But when, as in this case, the voluntary conveyance is to the wife, and the debtor's embarrassment proceeds to financial wreck, the conveyance is presumed conclusively to be fraudulent as to existing creditors 73 Ark. 174.

2.   Transactions between husband and wife are closely scrutinized in matters of this kind, and the burden is on her to show the good faith of the transaction.   Waite on Fraud. Conv. § 300; *Id.* § 301; 12 Cyc. 604; 86 Ark. 225; 74 Ark. 165; *Id.* 225; 59 Ark. 614; If, by reason of a voluntary conveyance by a debtor, his creditors are afterwards hindered or defeated in obtaining satisfaction of their demands, the conveyance is void, notwithstanding the debtor may, at the time of the conveyance, have retained sufficient property to meet his liabilities.   14 Am. & Eng. Enc. of L. (2 ed.) 330 and cases cited. Because there may not exist any definite purpose in the mind of the donor to defraud his creditors, it does not follow that his conveyance is therefore valid.   His innocence of an evil intention in making the gift, even when it is made through an honest mistake as to his financial condition, can not validate his act. He is bound to know his circumstances and the just demands upon him, and a passive disregard of his obligations is no less fraudulent in the eyes of the law than an active intention to defraud.   14 Am. & Eng. Enc. of L. (2 ed.), 350; 73 Fed. 327; 109 Ala. 563.

The invalidity of a voluntary conveyance is determined, not by whether the doner knew himself to be insolvent, but by the fact of his insolvency.   5 Mo. App. 548.

3.   The chancellor's finding that Brady was insolvent at the time the transfers were made and that such transfers brought about his financial ruin will not be reversed by this court unless against the clear preponderance of the evidence.   71 Ark. 605; 68 Ark. 314; 67 Ark. 200; 73 Ark. 289; 72 Ark. 67; 75 Ark. 52.

FRAUENTHAL, J. This was an action instituted by a trustee in bankruptcy to set aside and cancel certain transfers of shares of stock of a corporation made by the bankrupt, J. T. Brady, to his wife Laura Brady, upon the ground that such transfers were fraudulent as to the creditors of said bankrupt

It appears that about January 1, 1906, a corporation, known as the Brady Mercantile Company, was organized under the laws of the State of Arkansas, with its domicile in Lawrence County. J. T. Brady was its chief promoter, and subscribed for and was the owner of 322 shares of its capital stock, of the par value of $25 per share, at the time of its organization. Shortly thereafter, he also engaged with one Otto Marcur in a partnership business, located in Union County, which was dissolved by mutual consent in August, 1906. At that time Marcur owned 64 shares of the stock of the Brady Mercantile Company; and in consideration of Brady's interest in the partnership business he sold these shares to Brady. At the same time Brady agreed to pay to a creditor of the partnership in Texas the sum of $5,000,. due by the firm to that creditor. These shares of stock in the Brady Mercantile Company were transferred by Marcur to Mrs. Laura Brady, and new certificates were issued to her therefor. Later on stock dividends were declared by the corporation from time to time for the years 1907, 1908 and 1909; and the dividends thus declared upon the 322 shares owned by J. T. Brady, as well as upon the Marcur stock, were paid by the issuance of dividend stock to his wife, Laura Brady, in whose name certificates were issued by the corporation.

J. T. Brady also purchased 40 shares of said stock from one D. S. Weir in January, 1909, and had the same transferred to his wife, for which new certificates were issued to her by the corporation. The testimony does not definitely show the total number of shares of stock of the Brady Mercantile Company thus obtained by Mrs. Laura Brady. In the complaint, these various certificates issued to her are set out, and also the number of shares contained in each certificate; and they amount to 258 shares. But the certificate filed by the officials of the corporation with the county clerk, as required by section 848 of Kirby's Digest, shows that 263 shares of the stock of said

corporation appeared in the name of Laura Brady according to the books of the corporation. It is conceded that all the shares of stock which were in the name of Mrs. Laura Brady were obtained by her as dividend stocks except the Marcur and the Weir stock, and the complaint seeks to set aside all transfers made to her and all certificates of stock issued in her name, and to declare these the property of said J. T. Brady and subject to the payment of his debts.

The chancellor found that the Marcur and Weir stocks were purchased and paid for by J. T. Brady, and that all the dividend stocks issued to her arose from these stocks and the shares owned by J. T. Brady at the time of the organization of the corporation. He also found that at the time such transfers were made to her, and of the issuance of the several shares of stock to her, J. T. Brady was greatly involved in debt, embarrassed financially, and insolvent. The chancellor further found that the transfer and issuance of all these shares of stocks to Laura Brady were fraudulent and void as to the creditors of her husband, J. T. Brady. A decree was accordingly entered setting aside the transfers and issuance of said stock to Laura Brady, and declaring same assets of the estate of J. T. Brady, the bankrupt.

The uncontroverted testimony in this case shows that Laura Brady had no separate property or business of her own. She testified that she assisted her husband in accumulating the property owned by him at the time said corporation was organized; but, according to her own testimony, the only services performed by her were connected entirely with her domestic duties in the family. The sole consideration which she claims was given for the transfer and issuance of these various shares of stock to her was as follows: She testified that she objected to her husband entering the corporation, and that she waived her objection thereto upon his agreeing that all profits arising to him from the business should go to her, and that the dividend stocks were issued to her in pursuance of that agreement.

The evidence clearly shows that the stocks obtained from Marcur and Weir were purchased and paid for solely by her husband, J. T. Brady. It appears that for a portion of the purchase money of the Weir stock he borrowed $270, and exe-

cuted therefor a note to the lender, with an individual as surety thereon. Some time after the purchase of this stock, and after Brady had been adjudged a bankrupt, a mortgage was executed by Brady and his wife upon his homestead for the purpose, amongst other things, of securing money to pay this note, which was done. But the money thus obtained went to pay the note and thus protect the surety thereon. It was paid long after the stock was purchased by J. T. Brady. If, therefore, we should consider that by reason of her relinquishment of her homestead rights she obtained an interest in this money as her separate property, still the evidence clearly shows that this money did not go to purchase the Weir stock, but was applied solely to the indebtedness of her husband, which was not in any way a lien upon the stock. We are of opinion, therefore, that the wife, Laura Brady, paid no legal consideration for any of said stock, and that all of it was purchased and paid for by her husband, J. T. Brady, and that the transfers and issuance of the stocks to her were in effect and in fact voluntary conveyances thereof by him to her.

The question then presented is, whether the voluntary conveyance of this stock thus made by the husband to the wife is valid as against his creditors. This is largely a question of fact, depending upon the financial condition of J. T. Brady at the time the gift was made. It has been held that if the donor owes no debts at the time the gift is made, or if his debts are small in amount in comparison with the properties he then owns, and after such gift he retains property amply sufficient to pay all debts then existing against him, the gift made under such circumstances will be valid. But it is also well settled that a voluntary transfer of property by one in debt is presumptively fraudulent as to creditors then existing; and if the debtor is, at the time of such gift, insolvent, or if the gift is of such amount, or made under such circumstances that it will hinder or delay or defraud existing creditors of such donor, then such voluntary conveyance or transfer becomes conclusively fraudulent and invalid as to such existing creditors.

This court said, in the case of *Rudy* v. *Austin*, 56 Ark. 73; "The law requires every man to be just before he is generous. If he makes a voluntary conveyance while he is in debt, it presumes that it is fraudulent as to existing creditors, and the

burden is on those claiming under the conveyance to repel the presumption. If he be insolvent and unable to pay his debts, the presumption that it is fraudulent as to antecedent creditors is conclusive." And in that case there is also quoted this rule announced in the case of *Driggs* v. *Norwood,* 50 Ark. 46: "Every voluntary alienation of his property by an embarrassed debtor is presumptively fraudulent against existing creditors. Indebtedness raises a presumption of fraud, which becomes conclusive upon insolvency." *Campbell* v. *Jones,* 52 Ark. 493; *Stix* v. *Chaytor,* 55 Ark. 116; *May* v. *State Nat. Bank,* 59 Ark. 614; *Sumpter* v. *Ark. Nat. Bank,* 69 Ark. 224; *Jones* v. *Mallory,* 76 Ark. 509.

In the case of *Wilks* v. *Vaughan,* 73 Ark. 174, it was held (quoting from syllabus): "Conveyances made to members of the household and to near relatives of an embarrassed debtor, are looked upon with suspicion and scrutinized with care; when voluntary, they are *prima facie* fraudulent; and when the embarrassment of the debtor proceeds to financial wreck, they are presumed conclusively to be fraudulent as to existing creditors." To the same effect, see *Davis* v. *Yonge,* 74 Ark. 161; *McConnell* v. *Hopkins,* 86 Ark. 225.

It appears from the testimony that, at the time these shares of stock were transferred to and placed in the name of his wife, J. T. Brady was largely indebted to the Bank of Black Rock and other creditors, and was in an embarrassed financial condition. He then owed the Bank of Black Rock the sum of $8,000, and owed to a creditor in Texas the sum of $5,000, and was indebted to other parties. His assets at this time consisted of properties which were of the value of from eight to nine thousand dollars. When, therefore, these voluntary conveyances of his stock in the Brady Mercantile Company were made to his wife, he owed a large amount of existing indebtedness, and did not own property sufficient to pay it. Subsequently, he filed a petition in voluntary bankruptcy, and was adjudged a bankrupt. This was the finding of the chancellor, and we think that his finding is sustained by the preponderance of the evidence. It follows that the chancellor did not err in finding that Brady was insolvent at the time the transfers of these shares of stock were made to his wife.

It appears, in addition to this, that one Otto Marcur

claimed that Brady was largely indebted to him, and subsequently suit was instituted upon this claim which resulted in a judgment by confession in the sum of $2,500 against Brady. As above stated, Brady was soon thereafter adjudged a bankrupt. It also appears from the testimony that prior to the time that any of the dividend stocks were declared and issued to Laura Brady by the Brady Mercantile Company, J. T. Brady had transferred and pledged to the Bank of Black Rock, his largest creditor, the 322 shares of stock owned by him in the Brady Mercantile Company in order to secure the said debt of $8,000 due to said bank. After Brady was adjudged a bankrupt, this stock was sold under and by virtue of said pledge, and, after applying the proceeds of said sale upon the said indebtedness to the bank, it left a balance of something in excess of $4,000 still due to it. During all the time the dividend stocks were being declared upon these 322 shares of stock in said Brady Mercantile Company and placed in the name of Laura Brady, the original shares were pledged to and in the possession of said bank. J. T. Brady was the president of the Brady Mercantile Company, and the testimony shows that his wife knew of the pledge of this stock to the bank. It therefore appears from the testimony that at and before the time the dividend stocks were declared and issued to Mrs. Brady all parties knew that the original shares upon which such dividends were declared were pledged to the bank. By such pledge and transfer, the bank obtained the equitable title to these shares of stock in the Brady Mercantile Company without any formal transfer thereof upon the books of the corporation, and without any certificate thereof being filed in the office of the county clerk as provided by section 849 of Kirby's Digest, *Cecil Nat. Bank* v. *Watsontown*, 105 U. S. 217; *Johnston* v. *Laflin*, 103 U. S. 800; *Noble* v. *Turner*, 65 Md. 96.

As between the vendor and vendee, it is the settled rule that the vendee is entitled to all dividends on the stock declared after the sale thereof. In other words, the person entitled to the stock at the time the dividends are declared is also entitled to such dividends. Cook on Stock and Stockholders, § 541. A pledgee is protected in his rights to dividends upon stock in the same manner as a purchaser thereof; and therefore dividends declared during the continuance of the pledge belong

to the pledgee. All persons having notice of such pledge will be affected by the rights of the pledgee to such dividends. Cook on Stock and Stockholders, § § 432, 468; *Hill* v. *Newishawanick*, 8 Hun 459, affirmed in 71 N. Y. 593; *Boyd* v. *Conshohocken Mills*, 149 Pa. St. 363.

According to the testimony adduced in this case, the 322 shares of stock of the Brady Mercantile Company owned by J. T. Brady were transferred to the Bank of Black Rock long prior to the time any dividends were declared thereon, and these stock dividends issued to his wife were declared thereon during the continuance of that pledge. Mrs. Laura Brady had full knowledge that the pledge was made at the time these stock dividends were issued to her. These stock dividends, therefore, belonged to the creditor to whom the stock had been pledged, and all voluntary transfers or issuance to the wife of the pledgor of the stock dividends declared thereon were, under the facts and circumstances of this case, a fraud upon the right of such creditor, and were therefore illegal and void.

It is urged by appellants that J. T. Brady was solvent at the time these shares of stock were transferred and issued to his wife. It is claimed that J. T. Brady owned other properties, especially some stock in other corporations, of the face value of several thousand dollars. But, upon an examination of the testimony, we find that the actual values of these stocks were small, and did not materially increase the total amount of his assets. According to the testimony, the chancellor found that the liabilities of J. T. Brady were far in excess of his assets at the time the transfers and issuance of these stocks were made to his wife. As before stated, we think that this finding of the chancellor is not contrary to the weight of the evidence adduced upon the trial of this case.

From this it results that we have here a case where a husband, engaged in business and involved in debt resulting in insolvency, made a voluntary transfer of property to his wife. Under the law, it follows that as against existing creditors such transfer was fraudulent, no matter how pure the motive which induced it, because from the testimony the result of such transfer was to reduce the assets of the husband to such an extent as to delay and hinder his creditors in the collection of their debt. *May* v. *State Nat. Bank, supra.*

But in this case it may also be found that these transfers were made with actual intent to defeat the creditors of the husband. According to the testimony, virtually all the property which the husband owned consisted of this stock in the Brady Mercantile Company, and he transferred to his wife all profits and dividends arising therefrom, and was continuing to do so. The effect of such transfers was to deprive the creditors of all benefits arising from the ownership of such stock, and thus to hinder and delay the creditors in the collection of their debts.

After a careful examination of all the testimony adduced upon the trial of this case, we are unable to say that the finding made by the chancellor is contrary to the weight of the evidence. On the contrary, we are of the opinion that his finding is, under the law, well sustained by the testimony. It follows that the decree which the chancellor rendered is correct, and should be affirmed.