## DUNBAR *v.* ALPHIN.

### Opinion delivered June 11, 1917.

FRAUD́ULENT CONVEYANCES—HUSBANĎ TO WIFE.—Conveyances made by a husband to his wife are looked upon with suspicion and are to be scrutinized with care, and when voluntary, are *prima facie* fraudulent; and when the debtor is insolvent they are presumed conclusively to be fraudulent as to existing creditors.

Appeal from Union Chancery Court; *James M. Barker,* Chancellor; affirmed.

*J. W. Warren,.* for appellants.

1. There was no fraud in the execution of the deed from Dunbar to his wife. He owed her $800 and had a right to prefer her. 76 Ark. 252. Good faith is shown.

2. Dunbar was not insolvent. After the conveyance to his wife he had left 160 acres totally unencumbered, outside of his homestead.

3. The conveyance was made to his wife by Dunbar with the knowledge and approval of appellee. 20 Cyc. 427, 433, 434-5; 28 S. W. 984. No fraudulent intent was shown.

*Mahony & Mahony* and *H. S. Powell,* for appellee.

1. The evidence supports the decree that the deed from Dunbar to his wife was fraudulent as to creditors. He was insolvent. 56 Ark. 73; 50 *Id.* 46; 68 *Id.* 162; 86

*Id.* 325; 73 *Id.* 174; 91 *Id.* 399; 74 *Id.* 161; 105 *Id.* 90; 106 *Id.* 230; 108 *Id.* 164.

STATEMENT BY THE COURT.

J. H. Alphin instituted this action in the chancery court against J. G. Dunbar and Sarah Dunbar to cancel and set aside as a fraud upon his rights as a creditor a deed from husband to wife. The facts are substantially as follows:

J. G. Dunbar became indebted to Mrs. A. L. Alphin upon an open account. Her husband, J. S. Alphin, was her agent and transacted all her business for her. She died on the 2d day of March, 1909, intestate, and left surviving her the plaintiff, J. H. Alphin, as her sole heir at law. J. S. Alphin was the general agent of J. H. Alphin and transacted his business for him. J. S. Alphin asked Dunbar to pay the account from time to time after the death of his wife and claimed that it amounted to over $3,000. Finally on the 18th day of November, 1911, in company with Emon O. Mahony, his attorney, he went to the residence of J. G. Dunbar about three and one-half miles from El Dorado in Union County, Arkansas, and pressed him for a settlement of the account. He insisted that Dunbar should give him a mortgage on his lands to secure the account and Dunbar agreed to do so if it was satisfactory with his wife, and promised to come in that afternoon and execute the mortgage. Alphin and Mahony then returned to El Dorado and a short time afterwards on the same day the father-in-law of J. G. Dunbar went into the circuit clerk's office and filed for record a deed from Dunbar to his wife to 120 acres of land. The deed was executed on February 7, 1911. J. H. Alphin at once filed suit in the circuit court against J. G. Dunbar for the sum of $3,159.07 and caused an attachment to be issued and levied on the lands in controversy together with other real estate belonging to Dunbar. On December 23, 1911, J. H. Alphin instituted this action in the chancery court against J. G. Dunbar and Sarah Dun-

bar, his wife, to cancel and set aside the deed as a fraud upon his rights as a creditor. On May 14, 1915, J. H. Alphin obtained judgment in the circuit court against J. G. Dunbar in the sum of $2,300. The attachment branch of the case was not tried until the 10th day of April, 1916, at which time the attachment was sustained. Dunbar owned 440 acres of land, 160 of which constituted his homestead. All of the land was ordered sold under the attachment except his homestead. The lands ordered sold under the attachment were the 120 acres in controversy and also 160 acres which had been deeded to his attorneys as a fee for defending the suits brought against him by J. H. Alphin. The lands sold under the attachment were bought by J. H. Alphin for the sum of $2,600. At the September term, 1916, the present action was tried by the chancellor and it was decreed that the deed from Dunbar to his wife to the 120 acres in controversy should be canceled, the court having found that it was executed in fraud of the rights of Alphin as a creditor. The Dunbars have appealed.

HART, J., (after stating the facts). It is well settled in this State that conveyances made by the husband to his wife are looked upon with suspicion and scrutinized with care; when voluntary, they are *prima facie* fraudulent; and when the debtor is insolvent they are presumed conclusively to be fraudulent as to existing creditors. This rule is so firmly established in this State that only a few cases in support of it need be cited. *Driggs & Co.'s Bank* v. *Norwood,* 50 Ark. 46; *Brady* v. *Irby,* 101 Ark. 573; *Goodrich* v. *Bagnell Timber Co.,* 105 Ark. 90; *Papan* v. *Nahay,* 106 Ark. 230; and *Simon* v. *Reynolds-Davis Gro. Co.,* 108 Ark. 164.

In the present case an attempt is made by Dunbar to show that he owed his wife at the time he executed the deed to her. He, himself, testified that he owed her $800 and executed the deed to her in payment of it. The deed itself recites a consideration of $800. He testified that right after they were married his wife let him have

$100 in gold which his father-in-law had given her; that her father also gave her eleven head of hogs and two yearlings; that the rest of the money she let him have came from this stock and its increase. He admitted that he never gave his wife a note or other evidence of his indebtedness to her. He stated that she kept an account of it but no offer to introduce this account in evidence was made. He also admitted that he took possession of the cows and hogs and assessed them in his own name and paid taxes on them. The account in question was a running account extending over a period of nearly ten years. The record does not show the exact number of years Dunbar had been married, but it does show that they had six children. The deed in question was executed on February 7, 1911, and it was not filed for record until the afternoon of November 18, 1911, the day on which Alphin and his attorney pressed Dunbar for security for the debt. Dunbar says that he does not know why the deed was not recorded sooner. Mrs. Dunbar was not a witness in the case and no excuse is given for her not testifying. All these circumstances negative the idea that Dunbar conveyed the land in good faith to his wife in payment of a debt which he owed her. It was also shown by a brother and a tenant on the place that they heard Dunbar state to J. S. Alphin that he would have to let his wife have something to satisfy her and that Alphin replied that it would be all right for him to do so; for he would have three hundred acres left and that would be worth from ten to fifteen thousand dollars. They said he spoke of conveying 120 acres to his wife. Alphin denies that he made any such statement to Dunbar. The tenant states that this conversation occurred right after Christmas; that he remembers it occurred at this time because he left for Louisiana in March, 1911. He stated that he did not remember any other part of the conversation. According to his testimony this conversation occurred early in 1911, before the deed was executed. According to Dunbar's brother,

this conversation occurred only two or three weeks before Alphin sued Dunbar and attached his land. Besides this, Doctor Hilton testified that Dunbar talked with him about Alphin's claim and thought that it was too much. He told him he wanted to tie up his land in some way until he could get a settlement out of Alphin. He stated that he had more land than he could claim as exempt and wanted to sell or mortgage a part of it in order to effect a settlement with Alphin. Alphin and Mahony both testified that when they pressed Dunbar for security in November, 1911, that he did not say anything about having conveyed the land to his wife, but on the other hand promised to give Alphin a mortgage on it to secure his indebtedness. Instead of doing as he promised them, his father-in-law went immediately and filed the deed which he had previously executed to his wife. He also claimed that his remaining property was worth much more than the debt he owed to Alphin. In response to this claim it may be said that he conveyed this 120 acres to his wife for a consideration of $800 and that the land in question together with the other 160 acres owned by him which was subject to execution only brought $2,600 at the sale under attachment. After the attachment was levied upon his land he conveyed the 160 acres to his attorneys for their fee in defending the suits brought by Alphin. If the lands had been worth $15,000, as claimed by Dunbar, it is to be presumed that they would not have permitted them to be sold for the sum of $2,600, or that Dunbar would have conveyed them to his attorneys for their fee and for no additional consideration. Dunbar's wife had permitted him to use her property for a period of time extending over eight or ten years and to obtain credit on the faith of his owning it.

Under all the facts and circumstances adduced in evidence, we are of the opinion that the preponderance of the evidence shows that Dunbar was insolvent at the time he conveyed the property in question to his wife and that he conveyed it to her in order to defeat the

plaintiff in the collection of his debt. Therefore, the chancellor was right in his conclusion of fact, and properly granted the plaintiff relief prayed for in his complaint.

It follows that the decree must be affirmed.