**UNITED STATES of America,**
**Plaintiff,**

v.

**Clarence JOHNSTON et al., Defendants.**
**No. E.D. 1023.**

United States District Court
W. D. Arkansas,
El Dorado Division.
Aug. 24, 1965.

Charles M. Conway, U. S. Atty., Western District of Ark., Fort Smith, Ark., for plaintiff.

James T. Gooch, Arkadelphia, Ark., for defendants.

HENLEY, District Judge.

■ This is an action brought in the name of the United States on behalf of the Small Business Administration, SBA, against Clarence Johnston of Harrell, Calhoun County, Arkansas, and certain close relatives of Johnston for the purpose of obtaining a money judgment

against him and for the further purpose of setting aside as fraudulent 15 conveyances of Calhoun County real estate executed by Johnston and his wife in favor of the other defendants.[1]

On May 11, 1961, the Vernon Bank of Leesville, Louisiana, with SBA participation, made a $250,000 loan to the Leesville Industrial Development Association, LIDA, to finance the construction of a large sawmill in the City, which mill was to be built and operated by Johnston. As a condition to its participation in the loan SBA required Johnston to execute an unconditional personal guaranty that the loan would be repaid.

For reasons which will appear, the mill operation was a failure, and the $250,000 loan, which was secured by a first mortgage on the mill properties, was not repaid. The note and mortgage were assigned by the Bank to SBA, and in 1963 the Government filed a foreclosure suit against LIDA in the United States District Court for the Western District of Louisiana. On December 18, 1963, that Court rendered judgment against LIDA in the principal sum of $250,000 plus interest and certain items of expense. Foreclosure of the mortgage was decreed, and the mill properties were sold. The sale produced only $135,000. Of that sum $28,620.61 was credited to accrued interest and $98,288.37 was credited to principal leaving a deficiency of $151,-711.63.

Johnston's guaranty was one of payment rather than of collection and before the Louisiana case went to judgment, the Government made demand on Johnston for the full amount of the debt plus accrued interest. When payment from Johnston was not forthcoming, this suit was filed in early December 1963.

Originally, Mr. Johnston was the only person named by the Government as a defendant in this case, and he filed a motion to dismiss the complaint or, in the alternative, for a transfer of the cause to the Western District of Louisiana where the Government's suit against LIDA was still pending. The Government resisted that motion.

On January 7, 1964, the Court advised counsel informally that Johnston's motion probably would have to be denied in its entirety. On February 6, 1964, the Government filed a motion for leave to file an amended and substituted complaint bringing in new parties and seeking additional relief. On February 28, 1964, the Court entered a formal order denying the motion of Johnston and granting that of the Government.

On March 2, 1964, the Government filed its amended and substituted complaint bringing Mr. Johnston's relatives into the case and seeking to have cancelled as fraudulent the conveyances executed in their favor by Johnston and his wife. In due course the defendants answered denying that the Government was entitled to any of the relief sought by it.

Two pre-trial conferences have been held in the case, and the parties have made efforts, more or less diligent, to effect a settlement. It appearing at length that the case would have to be tried, the Court, after overruling a motion for a jury trial filed by the defendants, heard the matter without a jury. The cause was submitted upon the pleadings, discovery material, voluminous documentary evidence, oral testimony, and memorandum briefs. This opinion incorporates the Court's findings of fact and conclusions of law.

Although Mr. Johnston denied formally that he was indebted to the Government on his contract of guaranty, he has never seriously pressed that contention. In January 1965 pursuant to a motion

---

1. Federal jurisdiction is, of course, established. Rule 18(b) of the Federal Rules of Civil Procedure permits a claim for a money judgment and a claim to have a conveyance set aside as fraudulent to be joined in the same action. It is thus unnecessary for a claimant to obtain a judgment against his debtor before suing to set aside as fraudulent a conveyance made by the latter to a third person. Arkansas has a statute comparable to Rule 18(b), namely Ark.Stats., 1947, § 68–1308.

filed by the Government, which Johnston did not resist, the Court entered an in personam judgment against him in the sum of $156,368.33 representing the amount of the deficiency on the mortgage debt plus additional interest thereon down to October 5, 1964. Hence, the controversy with which the Court is now concerned relates to the contentions of the respective parties relative to the conveyances which the Government attacks as fraudulent.

The challenged conveyances are 15 in number. The first one bears date of November 2, 1960, and was filed for record in Calhoun County on November 9 of that year. The next twelve were all filed for record on July 18, 1961. Of those twelve deeds three are dated June 22, 1961, two are dated June 24 of that year, one is dated June 27, two are dated June 29, two bear date of July, and two are dated July 5. The remaining two deeds are dated June 5, 1963, and both were filed for record on June 7 of that year.

Before undertaking to define the issues or to state the contentions of the parties relative to the validity of those instruments as against the Government, the Court deems it well to set out some background facts and to outline the events leading up to, surrounding, and following the execution of the deeds.

For many years prior to the happening of the events which gave rise to this lawsuit Mr. Johnston had been engaged extensively in the sawmill business and in other revenue producing enterprises. By 1960 he was known in Louisiana as a successful sawmill operator and business man. As of the spring of that year he had a net worth of more than $500,000, consisting of cash in banks, notes receivable, motor vehicle equipment, and lands and town lots in Calhoun County, Arkansas.

Early in 1960, or perhaps shortly before that year, Johnston and his wife moved from Harrell to Leesville where Mr. Johnston purchased a home. In 1960 he and other Leesville business men formed LIDA for the purpose of promoting industry in that City and in the area. Apparently, LIDA initiated two projects. One of them was known as Reynolds Lumber Co., with which the Court is only slightly concerned in this case; the other was the Johnston Lumber Co. with which the Court is directly concerned.

In connection with the Johnston Lumber Co., which was formed as a Louisiana corporation in June 1960, the plan of LIDA was that Mr. Johnston would construct and subsequently operate a large mill for the manufacture of pine lumber; it was contemplated that pine chips would be produced as a by-product of the sawmill operation, and that those chips would be sold profitably to International Paper Company's mill at Springhill, Louisiana. The mill, when constructed, would be the property of LIDA but was to be sold by LIDA to Mr. Johnston or to the Johnston Lumber Co. under a lease-purchase agreement.

The construction of the mill was to be financed by means of a $250,000 loan in which SBA was to participate to the extent of 90 percent; five percent of the loan was to be carried by the Vernon Bank, and the other five percent was to be carried by the Merchants and Farmers Bank & Trust Co. of Leesville. This $250,000 loan was to be evidenced by LIDA's note to the Vernon Bank, and was to be secured by a first mortgage on the mill properties.

Certain de-barking machinery was to be acquired on credit from the Soderhamm Machine Manufacturing Co. at a cost of $92,731.09. That indebtedness was to be secured by a second mortgage on the properties.

A number of the members of LIDA, including Mr. Johnston, were also to participate in the financing of the construction by contributions amounting to something over $80,000, which were to be repaid in due course by the mill. That obligation was to be evidenced by the note of Johnston or his corporation to LIDA and was to be secured by a third mortgage on the properties. It appears that LIDA in turn was to give its own

notes to the respective contributors. Mr. Johnston's contribution was $26,000.

On March 25, 1960, application was made to SBA for 90 percent participation in the $250,000 loan. In that connection Mr. Johnston submitted to SBA a financial statement, and offered to put up, in addition to his LIDA contribution which has been mentioned, the sum of $125,000 as working capital for the mill.

The financial statement dated March 1, 1960, showed that Johnston had total assets of $548,500 and no liabilities. The reflected assets consisted of cash in various banks totalling $125,000, notes receivable totalling $150,000, equipment having a book value of $54,550, and real estate valued at $219,000.

On April 29, 1960, SBA agreed to participate in the project to the extent of 90 percent on the condition, among others, that Johnston personally guarantee the repayment of the $250,000 loan, and on the further condition that he supply working capital in the amount of $125,-000. While, as just stated, SBA participation was authorized in April 1960, no Government funds were actually disbursed until June 1961.

Construction of the mill was undertaken in 1960 and was prosecuted throughout that year with funds advanced by Johnston and additional funds apparently advanced by LIDA. While the construction was in progress the Johnston Lumber Co. was incorporated. Prior to the incorporation of that company Johnston had entered into a tentative agreement with LIDA to purchase the completed mill for a price of $323,045, payable over a ten year period. This obligation was to bear interest at the rate of five percent per annum, and Johnston or his corporation was to keep the premises insured and taxes paid.

By May 11, 1961, the mill was completed or essentially completed and was ready for operation, and that date is an important one in this litigation. While SBA participation in the loan had been authorized, final approval of such participation had been held up pending Johnston supplying the $125,000 in working capital which he was supposed to supply. On that date he was finally able to satisfy the Government that he had supplied the necessary working capital, partly in cash, and partly in timber inventory which SBA had agreed to approve as working capital in lieu of cash.[2] That requirement having been met or having been made to appear to have been met, the parties were ready to proceed.

On the date just mentioned LIDA executed its note and mortgage to the Vernon Bank evidencing and securing the $250,000 loan, and Johnston signed the written guaranty upon which the Government's claim is based. At the same time LIDA and Johnston Lumber Co. entered into a formal lease-purchase agreement under the terms of which the company was to buy the mill for a price of $331,-085.96 to be retired by monthly payments over a period of ten years, the payments to begin on August 11, 1961. On the same day LIDA executed its note for $26,000, payable to Johnston and evidencing his contribution to the $80,000 supplied by LIDA. The note was delivered to him in August 1961.

On May 12, 1961, the Johnston Lumber Co. executed and delivered to Johnston its note in his favor in the sum of $52,000. As the Court understands Johnston's deposition, his explanation of this transaction was that he felt that he had advanced more funds in connection with the construction of the mill than he was required to advance, and should be reimbursed for the excess. He estimated

---

2. It is by no means clear that the timber inventory and the cash which Johnston supplied or caused to be supplied totalled $125,000. It is inferable from Johnston's deposition that the $125,000 was made up of cash supplied by Johnston and one H. B. Greer, of whom more later, of timber inventory, and of some machinery and equipment which Johnston valued at $30,000. By means of certain exchanges of checks, which exchanges seem to have been fictitious, the impression was created that the timber inventory and the cash contributions totalled $125,-000.

that $52,000 would be sufficient for that purpose, and he took his corporation's note in that amount. No payment was ever made on the note, and in 1962 he surrendered it to the company in an effort to help it out of its financial difficulties.

The repayment by LIDA of the $250,000 loan was dependent upon Johnston Lumber Co. making the monthly payments called for by the lease-purchase agreement, and the payment schedules of the LIDA note to the Bank and of the lease-purchase agreement were essentially identical. Both instruments called for monthly payments of $2,651.50 each beginning on August 11, 1961, and the lease-purchase agreement provided that if the payment schedule of the mortgage note was altered, the payment schedule of the lease-purchase agreement would be amended correspondingly. The repayment schedule of the mortgage note was in fact amended with the consent of all parties so as to postpone the commencement of payments until August 11, 1962.

The lease-purchase agreement recited that the rights of the lumber company were subject to the first mortgage in favor of the Bank, the second mortgage in favor of Soderhamm, and the third mortgage in favor of LIDA. As of May 11, 1961, the lumber company had a contract with International Paper whereby the latter was to purchase pine chips; the lease-purchase agreement provided that the Soderhamm mortgage would be retired by allocating to that obligation 75 percent of the proceeds of the pine chip contract, and that after the second mortgage was discharged, the same percentage of the proceeds of the chip contract would be applied to the LIDA third mortgage. It was anticipated that both the second and third mortgages would be paid off within five years.

Johnston did not remain in charge of the Leesville mill very long. The record reflects that on June 19, 1961, a special meeting of the stockholders of Johnston Lumber Co. was held. In the course of that meeting the name of the corporation was changed from Johnston Lumber Co.

to Louisiana Pine Lumber Co.; Tom W. Johnston, a son of Clarence Johnston and a defendant in the case, resigned as a director and as secretary-treasurer of the corporation, and was succeeded in both capacities by H. B. Greer who has been mentioned. The record further reflects that on July 10, 1961, two meetings of the board of directors of Louisiana Pine Lumber Co. were held in the course of which Clarence Johnston resigned as president of the company and became chairman of the board. H. P. Greer was elected president of the corporation and was put in full charge of the operation. In August 1961 Mr. Johnston sold his home in Leesville and returned to Arkansas.

It will be recalled that twelve of the fifteen conveyances attacked by the Government were executed in June and July, 1961. And the Court now calls attention to the fact that all of those 12 deeds were executed between the June 19 stockholders' meeting of Johnston Lumber Co. and the July 10 directors' meetings of Louisiana Pine Lumber Co., and to the fact that those deeds were placed of record eight days after the July 10 meetings and before Johnston returned to Arkansas.

It was not long until it was discovered that Louisiana Pine Lumber Co. was seriously deficient in working capital, and in September 1961 the corporation applied to SBA for a loan of $150,000 to supply the deficiency. In connection with that application the company submitted a balance sheet showing assets of $140,637 and liabilities of $436,735, including the obligation to LIDA under the lease-purchase agreement. The application was accompanied by a number of personal history statements relating to the individuals connected with the corporation, including a statement signed by Johnston. Since Johnston submitted such a statement and was chairman of the board of directors, he was presumably familiar with the balance sheet which had been submitted.

In connection with the application now being discussed, certain correspondence, copies of which are in evidence, is of

interest. Apparently, the corporation before applying to SBA for the working capital loan requested Mr. Johnston to supply the necessary funds. On or about October 10, 1961, Johnston advised SBA that he was unable to make any further investment in the corporation. Under date of September 13, 1961, Mr. Greer advised SBA that the mill required a normal inventory of $250,000 value, and that its current inventory was only $74,-197; on the same date he advised SBA that he had "pointed out to Mr. Johnston in the beginning, the $125,000.00 cash operating capital you required before making the loan to (LIDA) is not enough for the business to do the volume needed to justify and pay for the plant investment."

On December 15, 1961, Mr. Hernandez, the president of LIDA, wrote a long letter to the Regional Director of SBA at Dallas, Texas, urging approval of the application for the additional loan. A copy of that letter was introduced in evidence at the trial by the defendants. Mr. Hernandez stated that the difficulties of Louisiana Pine Lumber Co. were due to lack of operating capital, and that the insufficiency was due to an initial underestimation of working capital requirements and to the fact that certain funds "were converted from operating capital to fixed assets which were needed for the successful operation of the business."

The application for the additional loan was granted in 1962, but the additional funds were not sufficient to save the enterprise. However, the company was able to operate throughout 1962 and into 1963. A transcript of the LIDA account with SBA indicates that on December 11, 1961, a payment on the first mortgage loan in the sum of $2,651.50, the amount of one monthly payment, was made and credited to interest; a similar payment was made and similarly credited

on December 4, 1962. The transcript reflects that on June 17, 1963, SBA paid taxes and insurance amounting to $2,-377.96, and further reflects that by October 24, 1963, a caretaker for the plant had been employed. As has been stated, the Government filed suit against LIDA in 1963, and the foreclosure decree was rendered in December of that year.

Section 68–1302 of Ark.Stats., 1947, provides in substance that transfers of property, whether real or personal, with intent to hinder, delay, or defraud creditors, whether prior or subsequent, are void. That statute is not dissimilar to Section 7 of the Uniform Fraudulent Conveyances Act which provides that transfers made with actual intent, as contrasted to intent presumed in law, to defraud, hinder, or delay creditors, whether present or future, are void.

 It is the theory of the Government that the transfers of which it complains were made by Johnston with actual intent to defeat the Government's claim or to hinder and delay the Government in collecting any judgment which it might obtain against Johnston. The Government contends further that when the transfers were made, the Louisiana Pine Lumber Co. was involvent, and that the transfers rendered Johnston insolvent because they left him with nothing but his interest in the Louisiana concern which interest, according to the Government, was worthless. Based upon that contention the Government argues that the transfers were presumptively fraudulent, and that in the circumstances here present the presumption is conclusive. In invoking that presumption the Government characterizes itself as an existing unsecured creditor on and prior to the dates of the transfers.[3]

The defendants deny that the Government is entitled to the benefit of any presumption of fraud, and deny that the transfers were in fact fraudulent. In

---

3. The Court finds it convenient to say at this point for the purpose of simplifying discussion later on that the Government's claim has not been established with respect to the 1960 conveyance from Mr.

and Mrs. Johnston to their son, Tom W. Johnston, of ¾ acre of land. That conveyance is valid in the Court's estimation, regardless of the validity of the other transfers.

addition, the transferee defendants allege that when the properties were conveyed to them, they had no knowledge or notice of any fraudulent intent on the part of Johnston and did not participate in any fraud of which he may have been guilty.

Regardless of whether the Court applies the fraudulent conveyance law of Arkansas, as such, or whether it applies a general federal common law of fraudulent conveyances, as the Government suggests that it should do,[4] the governing principles are well settled and may be stated without difficulty.

 A fraudulent conveyance may be defined generally as any transfer of property made with intent to hinder, delay, or defraud creditors, whether prior or subsequent, which transfer in fact operates to the prejudice of such creditors. Such a transfer may be set aside at the suit of an injured creditor, but no relief will be granted with respect to a transfer which, although abstractly fraudulent, does not operate to the prejudice of creditors' rights. 24 Am.Jur., Fraudulent Conveyances, § 173; Baker v. Gowers, 180 Ark. 1110, 25 S.W.2d 438; Cook v. Cook, 12 Ark. 381; Bank of Sun Prairie v. Hovig, W.D.Ark., 218 F.Supp. 769; Sieb's Hatcheries v. Lindley, W.D. Ark., 111 F.Supp. 705, aff'd 8 Cir., 209 F.2d 674.

 On the issue of fraudulent intent the ultimate burden of persuasion is always upon the plaintiff, but prior or existing unsecured creditors may be aided in carrying that burden by a presumption of fraud which in instances may be conclusive. It is in connection with this presumption that the differences between existing and subsequent creditors and secured and unsecured creditors becomes important.

 A transfer by an embarrassed debtor without valuable consideration or for a grossly inadequate consideration is viewed with suspicion, particularly where the transferee is a member of the transferor's family or a close relative of his. Such a transfer is presumptively fraudulent as to existing, unsecured creditors, and if made while the transferor is insolvent, or if the transfer renders him insolvent, the presumption of fraud is conclusive, that is to say, in such a case the subjective intent of the transferor is not material. See Kelker v. Hendricks, 228 Ark. 222, 306 S.W.2d 691; Chronister v. Jernigan, 196 Ark. 615, 119 S.W.2d 538; Evans v. Cheatham, 183 Ark. 82, 34 S.W.2d 1076; Mente & Co., Inc. v. Westbrook, 181 Ark. 96, 24 S.W.2d 976; Home Life & Accident Co. v. Schichtl, 172 Ark. 31, 287 S.W. 769; Simon v. Reynolds-Davis Grocery Co., 108 Ark. 164, 156 S.W. 1015; Norton v. Elk Horn Bank, 55 Ark. 59, 17 S.W. 362.

 There is no such presumption available to a subsequent or secured creditor; such a creditor must prove fraudulent intent by evidence which is clear, cogent, and convincing. Kelker v. Hendricks, supra; Barry v. Cassinelli, 200 Ark. 627, 140 S.W.2d 112; Cave v. Zimmerman, 198 Ark. 684, 130 S.W.2d 717; Chronister v. Jernigan, supra; Gavin v. Scott, 172 Ark. 234, 288 S.W. 391; Home Life & Accident Co. v. Schichtl, supra; Brady v. Irby, 101 Ark. 573, 142 S.W. 1124; Rudy v. Austin, 56 Ark. 73, 19 S.W. 111; Driggs & Co.'s Bank v. Norwood, 50 Ark. 42, 6 S.W. 323.

 In a suit to set aside a conveyance as fraudulent, it is not indispensable for the plaintiff to prove that the transferor was insolvent at the time of the transfer or that he was made so by the transfer. If prejudice to creditors results, a transfer made with intent to hinder, delay or defraud them will be set aside even though the transferor was solvent at the time of the transfer and

---

4. Cf. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838; Southwest Engine Co. v. United States, 10 Cir., 275 F.2d 106; United States v. McCabe Co., 8 Cir., 261 F.2d 539; United States v. Latrobe Construction Co., 8 Cir., 246 F.2d 357; Texas National Bank of Houston v. Aufderheide, E.D.Ark., 235 F.Supp. 599; and United States v. Anthony, S.D.Iowa, 231 F.Supp. 414.

remained so thereafter, and this is so even where the transfer is supported by valuable consideration, provided that the transferee participated in the fraud or, according to some authorities, had knowledge or notice of the transferor's fraudulent intent. See 37 C.J.S. Fraudulent Conveyances §§ 99 and 100a. Where a fraudulent conveyance is voluntary, it will be set aside regardless of the transferee's knowledge of. or participation in the fraud. 24 Am.Jur. supra, § 27; 37 C.J.S., supra, § 118; Wright v. Aaron, 214 Ark. 254, 215 S.W.2d 725, 726; Hershy v. Latham, 46 Ark. 542; Galbreath v. Cook, 30 Ark. 417; Bank of Sun Prairie v. Hovig, supra.

 Obviously, however, the insolvency or financial embarrassment of a debtor at the time of or shortly after a transfer of property is of the utmost evidentiary importance both as bearing upon the question of fraudulent intent and as bearing upon the question of whether the transfer damaged his creditors.

In passing upon the issue of fraudulent intent courts have regard to the presence or absence in a given case of certain so-called "badges of fraud." In Harris v. Shaw, 224 Ark. 150, 272 S.W.2d 53, the Supreme Court of Arkansas said that the most common badges of fraud are the insolvency or indebtedness of the grantor, inadequate or fictitious consideration, retention of the property by the debtor after the purported transfer, the pendency or threat of litigation, secrecy or concealment of the transaction, and the fact that the transfer was carried out in a manner differing from usual business practice. (224 Ark. at 154, 272 S.W.2d 53, citing 24 Am.Jur., supra, §§ 14 and 17, and 1 Moore On Fraudulent Conveyances 222.)

 In the instant case the parties are in sharp dispute as to the status of the Government as a prior or subsequent creditor and as a secured or unsecured creditor. The Court finds it unnecessary to resolve those disputes because without the aid of any presumption of fraud the Court finds with the requisite degree of certainty, and from evidence which the Court believes possesses the requisite qualities and probative force, that when the 1961 conveyances and the two 1963 conveyances were made, Mr. Johnston was acting with an actual intent to hinder, delay, and defeat the Government with respect to its contingent claim against him, and that the transfers have resulted in prejudice to the Government. In this connection the Court finds that the transfers in question were characterized by at least four of the badges of fraud mentioned in Harris v. Shaw, supra.

The evidence discloses that substantially contemporaneously with his transfers of Arkansas lands in June and July, 1961, Johnston also gave to his wife all of his remaining cash and all of his notes receivable, except his note from LIDA, his note from Johnston Lumber Co., and what may be called the Menser note in his favor on which note there was due at the time a balance of between $3,000 and $4,000.[5] In addition, he gave to one of his sons what was left of the equipment which he had in 1960.

Those transfers left Johnston with the two tracts of land which he subsequently gave away in 1963 and which he himself valued at less than $800, with his stock in Louisiana Pine Lumber Co., some stock in Reynolds Lumber Co. worth not more than $2,500 at the time, and probably valueless now, the $26,000 note from LIDA, and the $52,000 note from Johnston Lumber Co., and the Menser note which has been described.

Thus it will be seen that following the transfers Johnston's assets, aside from his stock interest in Louisiana Pine

---

5. Following the entry of the personal judgment against Johnston, the Government was able to reach the Menser note by means of a writ of garnishment. The record indicates that the balance now due on the note is $3,200 payable at the rate of $400 per year with four percent interest. The next payment is due in November of the current year. It is probable that unless the Government succeeds in this action its recovery will be limited to the proceeds of the Menser obligation.

Lumber Co. and his claims against that company and against LIDA, liberally valued did not exceed $7,100; [6] certainly they did not exceed $10,000. Since LIDA's principal asset was its ownership of Louisiana Pine, it is clear that the value of Johnston's note from LIDA was directly dependent upon the financial condition of the lumber company, and, of course, the value of Johnston's claim against and stock in that company depended upon its financial condition. Thus the financial conditions of Louisiana Pine and of Johnston were essentially synonymous. If Louisiana Pine was insolvent or in precarious condition in July 1961, Johnston was also insolvent or in a precarious financial condition after he stripped himself of his Arkansas holdings.

In support of its contentions relative to the alleged insolvency of Johnston and Louisiana Pine the Government, after laying a proper evidentiary foundation, called to the stand an SBA accountant, J. E. Shinn, who testified as an expert and illustrated his opinions by a summary exhibit, Government's Exhibit #48, consisting of a number of sheets.

Shinn testified in substance that in his opinion Johnston was insolvent on July 18, 1961, to the extent of $110,720, and that after certain proper adjustments were made, his insolvency amounted to $258,517. As to the lumber company, Shinn testified that in his opinion that company was insolvent on July 18, 1961, to the extent of $375,312.47.

In the course of the trial and in their briefs counsel for the defendants and for the Government have, respectively, attacked and defended Mr. Shinn's opinions and figures. It would extend this opinion to undue length to undertake to state, analyze, and discuss the various arguments pro and con relative to Shinn's testimony. The Court thinks that Shinn's determinations are subject to serious criticism in certain important respects, and the Court does not accept Shinn's ultimate figures.

However, even after due allowances are made for what the Court considers to be the defects in Shinn's reconstruction of the financial status of Johnston and of the lumber company, the Court is persuaded and finds that the lumber company was very probably insolvent on July 18, 1961, and that Johnston was probably rendered insolvent by the transfers which have been mentioned. Certain it is that following those transfers both Johnston and the company were in a most precarious financial condition.

Johnston could hardly have been ignorant of the fact that the lumber company was operating under a heavy load of debt, that it was under capitalized, and that its future was uncertain. As has been shown, it was only two months after the transfers in question that the lumber company filed a formal application for an additional loan from SBA, and it is unrealistic to suppose that Johnston was unaware of his company's difficulties or potential difficulties when he gave his Arkansas property away.

Certainly Johnston knew that he had a contingent liability to SBA of $250,000; he also knew that he had valuable tangible property in Arkansas which would be readily available to satisfy any judgment which the Government might obtain against him; and the Court thinks that Johnston must have realized that a claim or suit against him by the Government was not unlikely.

In that situation Johnston had a motive to put his property beyond the Government's reach by giving away essentially everything he had other than his interest in the lumber company and his claim against LIDA. If the company prospered ultimately, he would be safe. If the company failed ultimately, his property in Arkansas would be in the hands of his close relatives and unavailable to the Government. The temptation to hedge was strong, and the Court is convinced that Johnston yielded to it.

6. This figure is reached by valuing the remaining land at $800, the Reynolds Lumber Co. stock at $2,500, and the Menser note, payable as aforesaid, at $3,800.

Following the recording of the conveyances in July 1961 there was no visible change in the ownership or possession of the properties. While Johnston did tell some of the tenants of the business properties that their quarters had been conveyed to the transferees thereof, Johnston continued to collect the rents without change, and he failed to tell one of his principal tenants, Humble Oil & Refining Company, that there had been any change of ownership of the filling station property which Humble had rented.

More than this, the record reflects that the lands remained on the tax books of Calhoun County in Johnston's name, and that he paid the 1962 taxes on them in 1963. Still further, the evidence discloses that in connection with their 1962 and 1963 federal income tax returns Mr. and Mrs. Johnston claimed depreciation on the buildings just as they had done with respect to 1961. Those returns show also that Mr. and Mrs. Johnston reported rental income and farm income in both 1962 and 1963.

In preparing for trial the Government took the discovery deposition of Mr. Johnston. He answered the questions put to him, and the Court thinks that on the whole his answers were truthful as far as they went, but he did not volunteer any information. The trial before the Court lasted for approximately two days, and Johnston was present throughout the trial. He did not take the stand to explain the transfers or to dispute the Government's contentions about the financial condition of himself and of the lumber company in 1961. Nor did any of the transferees appear and testify.

Where a person's intent is in issue in a lawsuit, such person is entitled to have the trier of the facts consider, along with other evidence, such explanations of his conduct as he may care to offer. When no explanation is offered, the inference is permissible that a truthful explanation would have been adverse to the person involved.

The record contains a stipulation of counsel that the transferee defendants, if present, would testify that they are either children, daughters-in-law, mother, or sisters of the grantor, Clarence Johnston; that they did not know that Johnston had guaranteed the LIDA note prior to the time of the filing of this suit; and that they knew nothing of his business, having never been advised about it nor inquired into it. Assuming that such testimony, if given, would have been true, it would have been immaterial in view of the further stipulation that "the only consideration received by the grantors from the grantees for the conveyance (sic) was love and affection."

The Court has not discussed in detail the two 1963 conveyances. The same considerations which impel the Court to invalidate the 1961 transfers apply with equal if not greater force to the 1963 transfers, and the Court now finds those transfers to have been fraudulent and prejudicial to the Government.

Returning for the moment to the Government's suggestion that the case should be decided on the basis of federal common law, the Court wishes to make it clear, if it is not already so, that the invalidation of the 1961 and 1963 conveyances is not required by any rule of law peculiar to Arkansas, although the authorities cited herein have been principally Arkansas decisions. The Court finds that the conveyances in question would be held fraudulent and prejudicial under any relevant body of law, whether found in the Uniform Fraudulent Conveyances Act, the Bankruptcy Act, or elsewhere.

As stated, judgment has already been entered against Johnston personally. On the phase of the case now under consideration a decree will be entered cancelling and setting aside the 1961 and 1963 conveyances as fraudulent. The Government will then be in a position to sue out a writ of execution on its money judgment and cause the same to be levied on all of the properties or so much thereof as may be necessary to satisfy the Government's claim. The United States Attorney may present a precedent for an appropriate decree.