**FEDERAL DEPOSIT INSURANCE CORPORATION, Receiver of Western National Bank of Lovell, Wyoming, and Gerald L. Bass, Receiver pendente lite of Fort Lincoln Life Insurance Company and Fort Lincoln Assurance Company, Plaintiffs,**

v.

**BRITISH–AMERICAN CORPORATION, (a North Carolina corporation, the surviving corporation of the merger of British–American International Corporation a Florida corporation, and British–American Corporation, a North Carolina corporation) and British American Insurance Company, Ltd. (a corporation of the Commonwealth of the Bahamas), Defendants.**

No. 89–303–CIV–5–BR.

United States District Court,
E.D. North Carolina,
Raleigh Division.

Jan. 28, 1991.

Womble, Carlyle, Sandridge & Rice, G. Eugene Boyce, Laura V. Leak, Donald L. Smith, E. Whitney Drake and Gerald L. Bass, Bass, Powell & Bryant, Raleigh, N.C., for plaintiffs.

Maupin, Taylor, Ellis & Adams, John T. Williamson, Sharon L. Hartman, Raleigh, N.C., for defendants.

## MEMORANDUM OPINION

BRITT, District Judge.

This matter is before the court on plaintiffs' motions for summary judgment and on defendants' motion for partial summary judgment. The motions were thoroughly briefed and were supported and opposed by reams of documents, affidavits, deposition transcripts, and responses to discovery requests. Additionally, the court heard argument of counsel on 2 January 1991. This matter is now ripe for resolution.

### I. *Facts*

British American Insurance Company Limited ("BAICL") is a Bahamian corporation which is primarily involved in the selling of insurance. Its principal officers between 1977 and 1983 were David J. Thurlow, president and chief executive officer, and R. Peyton Woodson, III, chairman of the board of directors. George Ragsdale, at all relevant times, has been both a director of BAICL and its general counsel.

In 1962, BAICL opened a branch of its insurance business in Fiji ("BAICL–Fiji"), an independent nation in the South Pacific approximately 2000 miles due east of the northeast coast of Australia and the Great Barrier Reef. BAICL–Fiji's primary function was the sale of life insurance—it sold approximately 35,000 policies by 1983. Companies licensed to sell insurance in Fiji are regulated by Fiji's Commissioner of Insurance ("Commissioner"), an official appointed by Fiji's Minister of Finance.

Anant Kumar Tripati, a Fijian citizen, was employed by BAICL–Fiji in 1976. Previously, while working for the Bank of New Zealand ("BNZ") in Fiji, Tripati was charged by bank and police authorities with forgery, uttering a false document, and obtaining money on a forged document. Subsequent to joining BAICL–Fiji, Tripati admitted guilt to these charges, paid $700 in restitution, and was placed on probation. He resigned from BAICL–Fiji abruptly on 12 November 1978 and departed for the United States. When he left, a number of vital BAICL records and $50,000 mysteriously disappeared.

Tripati then began traveling throughout the world holding himself out as being from an extremely wealthy Fijian family which owned many banks and insurance companies. He claimed to control a family fortune of $300 million. In late 1982, Tripati formed a liaison with Milton Polland, an insurance consultant in California. In March 1983, Tripati acquired a dormant North Dakota insurance company named "Wells Fargo Insurance Company" and changed its name to "Fort Lincoln Life Insurance Company" ("FLLIC"). He thereafter incorporated another insurance company, Fort Lincoln Assurance Company ("FLAC") and the Fort Lincoln Group, which he intended to be a holding company for FLLIC and FLAC. At about the same time, Tripati gained control of three banks: Western National Bank in Wyoming ("WNB"), Community Bank of Hartford in South Dakota, and First National Bank of Wibaux in Montana. He then proceeded to sell to his three banks "annuity contracts" issued by his insurance companies. Through sales of this fraudulent product

and control of these banks, Tripati gained access to $26.7 million which he commingled in various accounts maintained at Imperial Bank in Los Angeles, California—the hub of Tripati's operations. More than $2 million of these commingled funds ended up in the bank account of FLLIC.

In February 1983, Tripati instructed Polland to make contact with BAICL and, while concealing Tripati's involvement, to attempt to purchase BAICL–Fiji. On 1 March 1983, in pursuit of the acquisition of BAICL–Fiji for Tripati, Polland contacted Roger Sayers at BAICL's office in Nassau, Bahamas. Polland told Sayers that he was a consulting actuary for an insurance firm operating in the far east (but declined to disclose its name) and requested an opportunity to meet with BAICL to discuss buying the Fiji branch. Sayers relayed the inquiry to Thurlow, who told Sayers to tell Polland that BAICL had no interest in selling its Fiji branch. Nevertheless, Polland and Thurlow eventually met in Malaysia on 2 April 1983 and reached agreement as to the general terms for the transfer of the Fiji business: Polland, as nominee for his undisclosed principal (Tripati), would make a down payment of $1.25 million with the balance of the adjustable final purchase price of $2 million being paid based on an appraisal of the net asset value. The agreement was contingent upon approval by both the board of BAICL and the Fiji government. The new company to which BAICL–Fiji would be transferred was initially named Pacific South West, but later the name was changed to Southwest Pacific ("SWP").

During the remainder of April, several significant events occurred on both ends as the parties attempted to solidify the deal. Thurlow caused an outline of the tentative agreement to be telexed to 1) BAICL in Nassau, which was requested to obtain a credit report and background check on Polland, and 2) Ragsdale in Raleigh, who was requested to draw up a contract. Wood-son, who had previously received a glowing recommendation about Polland's background from a former United States Congressman,[1] employed the services of a professional investigator, Bishop's Services Incorporated on 11 April 1983 to check Polland's background in more detail. On 27 April 1983, Tripati opened a bank account with $500,000 at the Los Angeles office of BNZ in the name of "Pacific South West Assurance Co., Ltd.," and told BNZ officials that FLAC was establishing an operation in Fiji under this name. The money was to provide the initial capital formation of the new company. Later that day, $2 million was withdrawn from FLLIC's Imperial Bank account and deposited at BNZ in the account of Pacific South West.

Although closing was initially set for 30 June 1983, or upon receipt of Fiji government approval, Polland, after reviewing Ragsdale's draft of the agreement, called Thurlow to say that he had received agreement in principle to the transfer from Fiji regulatory authorities, and that he was ready to close and pay the $2 million in full. Defendants' officers testified at depositions that they believed Polland's representations concerning government approval because of his willingness to part with $2 million in cash.[2] Nonetheless, in a telephone conversation with Ragsdale on 5 May 1983, Polland told Ragsdale that because a certificate of authority from the government had not yet been obtained, another document was needed from BAICL stating that BAICL would still be "on the risk" until the government issued a certificate to SWP. On 4 May 1983, Polland had requested by telex that a power of attorney be given from BAICL to SWP in order to allow the new corporation to conduct the business of BAICL–Fiji. In response to these requests, Ragsdale prepared an amendment to the agreement which permitted SWP to continue using BAICL's name for a period of one week following execution of the agreement and a "declaration" which empowered SWP to receive confiden-

---

1. Another BAICL inquiry into Polland's background, however, had suggested that Polland was not a reputable actuary.

2. Woodson stated at his deposition that "[a]nyone who would part with $2 million without having had such approvals would clearly be out of his mind."

tial information, endorse and collect checks lawfully due and payable to BAICL, and to proceed in legal matters in which BAICL may have had an interest.

Significant provisions of the final draft of the agreement included the following: 1) BAICL–Fiji was defined as all of its insurance policies, assets, and liabilities; 2) the completion date would be the date on which the purchase price was paid; 3) the purchase price was $2 million in cash; 4) upon execution of the agreement, Polland was to have obtained all necessary government approvals; 5) SWP was required to cease using BAICL's name after the completion date; 6) BAICL would transfer and assign to SWP all of its right, title, and interest in BAICL–Fiji on the completion date; 7) failure of Polland to obtain government approval for the transfer by the completion date would permit BAICL, but not Polland and SWP, to cancel the agreement on 14–days' written notice to Polland;[3] 8) the transfer contemplated by the agreement was contingent upon the obtaining of all necessary government approvals for such transfer; 9) Polland represented that he had obtained all necessary government approvals; and 10) the agreement would be interpreted and construed according to Fiji law.

The final draft of the agreement, signed by Thurlow on behalf of BAICL, was delivered to Polland in California on 5 May 1983. BNZ then transferred $2 million from the Pacific South West account to Imperial Bank where Polland proceeded to purchase an Imperial Bank cashier's check payable to BAICL in the amount of $2 million. Polland signed the contract and handed the check to Justin Tierney, a senior vice president of BAICL. Tierney then caused these funds to be wire transferred to a BAICL account in Nassau, Bahamas. The $2 million purchase price represented a profit to BAICL of approximately $1.25 million. The amendment allowing SWP to use BAICL's name for one week and the declaration were both executed on 6 May 1983; a subsequent amendment executed on 11 May 1983 extended until 31 May 1983 the time during which SWP would be permitted to use BAICL's name.

The day the transaction was consummated, 5 May 1983, Anil Shandil, general manager of BAICL–Fiji, was informed of the deal by BAICL officials and was told to await instructions from Polland.[4] Shandil also received a telex from Polland, signed on behalf of Fort Lincoln Group, Inc., informing Shandil to report from then on to S.M. Koya, chairman of the board and general counsel to SWP (and Tripati's long-time associate and lawyer). Polland also informed him that all BAICL–Fiji employees were thenceforth SWP employees and that their employment agreements would have to be renegotiated.

The accounts of BAICL–Fiji were on deposit with BNZ in Suva, Fiji. By telex dated 6 May 1983, BAICL notified BNZ that it had sold its Fiji insurance branch to SWP and directed BNZ to transfer all BAICL bank accounts to SWP and to await further instructions from Polland. At that time, BAICL–Fiji's deposits at BNZ totalled approximately $435,000.

Suspicious of the legitimacy of the transfer, and concerned about his own future financial welfare, Shandil visited the Fiji Commissioner's office on 6 May 1983, where he met with Deputy Commissioner Clive Amputch. Although neither SWP nor BAICL had given the Commissioner notice of the transfer, as is required under Fiji law, Shandil left the Commissioner's office with the impression that Amputch already knew about the sale. Two other significant events occurred on 6 May 1983: 1) SWP was officially incorporated in Fiji; and 2) the Bishop's Report requested by Woodson was completed. The report detailed Polland's involvement with both the Fort Lincoln companies and Tripati. The

---

**3.** The provision Thurlow had asked Ragsdale to draft was to allow *either party* to cancel if government approval was not obtained by 31 December 1983.

**4.** On 18 August 1981, Shandil had been given a power of attorney by BAICL to conduct the affairs of BAICL–Fiji which BAICL did not, upon executing the agreement, revoke. Indeed, the power of attorney has not been revoked to date.

earliest any of BAICL's officers remember seeing this report, however, is the latter part of May 1983.

At Polland's request, Shandil flew to Los Angeles to meet with him for several days beginning 11 May 1983. These meetings caused Shandil's suspicions to grow, as he never met with Polland in a corporate office [5] and Polland's remarks did not seem compatible with someone who just took over an insurance business. Upon his return to Fiji, Shandil continued to receive numerous instructions from Polland, some of which he implemented, and others, of a more dubious nature, of which he ignored.[6] Polland visited the Fiji branch around 1 June 1983 and met with Shandil and the other employees. Shandil also received instructions from Koya and others claiming to be officers of SWP. However, he also continued to receive some instructions from, and continued to correspond with, Thurlow.[7] Additionally, he continued to be paid, at least in part, by BAICL.

On 31 May 1983, BAICL first notified the Commissioner of the transfer, apologizing for its "serious oversight" in not notifying the Commissioner prior to the transfer as required. At this time, however, BAICL did not inform the Commissioner of the existence or contents of the Bishop's Report linking Polland and SWP with Tripati.

While these events were taking place in Fiji, various state and federal regulators in the United States combined to shut down Tripati's banking and insurance operations. On 20 May 1983, FLLIC was ordered by the Wyoming Department of Insurance to cease and desist from doing business in Wyoming, to void all Wyoming-based annuity contracts, including those issued to WNB, and to refund all premiums on such contracts. On 24 June 1983, the Comptroller of the Currency of the United States declared WNB to be insolvent and closed the bank. Pursuant to law, the Comptroller appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver of the failed bank. Tripati was later tried and convicted in federal court of fraud and banking law violations arising from the sale of his corporate annuities. Subsequently, FLLIC and FLAC ceased doing business.

On 25 August 1983, Peter Phillips, senior vice president of BAICL, wrote a confidential memorandum to Thurlow stating that "it seems fairly clear to me that our ex-employee [Tripati] is in fact behind the purchase, and is doing so with funds misappropriated from elsewhere (including from us)." Phillips recommended that the $2 million be refunded and that BAICL resume operating BAICL–Fiji because "[t]his might be the best of the uncomfortable options that might be ahead of us." Despite this memorandum, the Bishop's Report, and the fact that the Commissioner had not approved the transfer, BAICL made no efforts to undo the transaction. Several of its officers testified at deposition that attempting to undo the transfer 1) would have created legal problems and 2) would not have been in BAICL's economic interest because the value of the Fiji business as an ongoing concern had been depleted since the agreement was executed.

Insurance companies in Fiji are required to renew their insurance licenses annually. The schedule for renewal contemplates submission of a renewal application by 30 September and issuance of a renewed license prior to 31 December. On 12 September 1983, the Commissioner wrote to Thurlow explaining that approval for the transfer "has not been granted" and that BAICL would therefore need to apply for renewal of its insurance license before 30 September 1983. BAICL elected not to submit a renewal application, taking the position that it had sold its Fiji insurance

---

5. Polland had been instructed by Tripati not to bring Shandil into the Fort Lincoln offices, for fear that Shandil would recognize Tripati as the same individual who absconded with money and documents from BAICL–Fiji five years earlier.

6. One telex from Polland stated that Shandil was appointed acting vice president in charge of SWP's Fiji operations.

7. As late as 8 September 1983, Thurlow told Shandil that SWP did not have a proxy to run the business of BAICL–Fiji.

business to SWP and that any license relating to the affairs of that branch should be issued to SWP. Nonetheless, Koya, acting without BAICL's knowledge, submitted an application for license renewal on 30 September 1983 in the name of BAICL, which he signed as attorney-in-fact for BAICL. When the Commissioner brought this to BAICL's attention, it responded that Koya had no power of attorney from BAICL and that he had apparently tampered with the 6 May 1983 declaration to make it look as if he did.[8] On 14 September 1983 Ragsdale wrote Polland a certified letter insisting that SWP cease using BAICL's name in the operation of the Fiji insurance business, as such use constituted a breach of the 5 May 1983 agreement.[9]

SWP was extremely dissatisfied with BAICL's efforts to help it acquire government approval for the transfer. On 17 October 1983, Koya wrote Shandil a letter which indicated that SWP had, on 27 May 1983, submitted to the Commissioner an application for approval of the transfer of BAICL–Fiji from BAICL to SWP. The letter indicated that the Commissioner replied on 31 May 1983 that the application was missing an audited balance sheet and an actuary's report. It appears from the letter that, after much difficulty, SWP eventually obtained these items from BAICL. The letter continued that, due to Thurlow's correspondence with the Commissioner following SWP's application for renewal of BAICL–Fiji's insurance license, the Commissioner, on 13 October 1983, rejected the application. Koya's letter to Shandil further stated:

> Furthermore, we do not accept Mr. Therlow's [sic] argument that a complete transfer has taken place under the Sale & Purchase Agreement. In this regard we make the following comments:
>
> (a) That the Sale & Purchase Agreement was an agreement to sell the insurance business to our client company in futuro on a specified date. The Agreement itself did not and was not intended to convey upon execution the right, title and interest of British American to our client company. Indeed it could not have been done in view of the stringent provisions [of] our Insurance Act....
>
> (b) That to our knowledge no transfer document was ever executed by British American. Even if it did, it carries no validity until prior approval of the Commissioner of Insurance is obtained under Section 51 of the Insurance Act....

> We shall be grateful if you would take immediate steps to communicate with your principals in Bahamas and advise them of the grave situation that both parties are likely to face in the event ... the Application for the proposed transfer is not processed or [is] refused before 31st December, 1983 and if British American continues to take the present stance. The British American's attitude that they have nothing further to do in this matter is not only unreasonable but its arguments are untenable in the eyes of law.

In early November 1983, BAICL and the Commissioner engaged in correspondence in an attempt to arrange a meeting to attempt to resolve the Commissioner's concerns over the transfer of BAICL–Fiji. BAICL insisted that the meeting take place in Los Angeles. The Commissioner responded in a telex to Ragsdale as follows:

> Would insist that such a meeting take place in Fiji. You will be aware that I had requested David Thurlow to come and discuss the whole issue with me in Fiji. I had indicated to Mr. Thurlow of my feeling that British American had proceeded with the intended transfer of its business in this country in a very

8. The "tampering" consisted of the words "Power of Attorney" being typed across the top of the declaration. Other than this addition, the document submitted by Koya was exactly the same as the one executed on 6 May 1983. It is not apparent whether the addition was made by Koya or by the Fiji Register of Titles, where it was filed. It is worth noting that on at least two occasions Thurlow referred to this document as a "power of attorney" in correspondence to Polland.

9. Ragsdale also drafted a document entitled "Revocation of Declaration" which was executed by BAICL corporate officials.

shoddy way ignoring the provisions of the laws of this country.

Ragsdale responded with a telex to the Commissioner the following day:

> Your feeling that British–American has ignored the laws of Fiji has absolutely no basis in fact. Please review once again the agreement of May 5, 1983. You will observe that British–American insisted on compliance with Fiji law in every respect and required specific warranties to that effect. The strongest assurance of obedience to Fiji law is found in the fact that Polland paid $US 2,000,000 for the Fiji insurance business. We respectfully request you reconsider your feelings.

Ragsdale reiterated BAICL's insistence that the proposed meeting be held in Los Angeles. Due to the irreconcilable positions of the parties with respect to venue, no meeting was ever held.

On 7 December 1983, the Fiji Minister of Finance placed BAICL–Fiji under the official supervision of the Commissioner. Shandil was hired to manage the remnants of the Fiji branch and continues to do so at present. Under the Commissioner's supervision, the Fiji branch continues to service existing policies and the management of assets under the name "British American," but conducts no sales of new insurance policies. Eventually Polland gave FDIC an assignment of his interest in SWP and the Fiji branch and attempted to help FDIC find a buyer. No sale was ever made and the branch continues to be run and supervised by the Commissioner. On 10 May 1989, the Commissioner charged BAICL $179,816 for supervising the operations of BAICL–Fiji from 1984 to 1987. That sum remains unpaid.

Of critical importance to this lawsuit is the fact that subsequent to the execution of the 5 May 1983 contract of sale, no document has ever been executed transferring from BAICL to SWP or Polland: 1) the 35,000 insurance contracts entered into by BAICL–Fiji; 2) bonds owned by BAICL–Fiji; 3) policyholder loans evidenced by promissory notes held by BAICL–Fiji; 4) other securities held by BAICL–Fiji; 5) deeds to BAICL–Fiji's real estate; and 6) bank accounts in the name of BAICL–Fiji.[10] However, at no time since 5 May 1983 has BAICL attempted to exercise dominion over BAICL–Fiji's assets.

## II. *Procedural History*

This lawsuit has its origin in an 11 September 1984 judgment of the United States District Court for the District of Wyoming which ordered FLLIC to pay FDIC, as receiver for WNB, the $5,694,381.77 which WNB lost in Tripati's corporate annuities scheme. Unable to satisfy this judgment through FLLIC, FDIC, as a judgment creditor of FLLIC and FLAC, filed suit against BAICL in the Central District of California to recover the $2 million conveyed from FLLIC to BAICL on 5 May 1983. BAICL moved to dismiss for lack of in personam jurisdiction because, it argued, it conducted no business in the United States. Based upon sworn declarations to this effect, the suit was dismissed and the dismissal was upheld on appeal. *Federal Deposit Ins. Corp. v. British–American Ins. Co.*, 828 F.2d 1439 (9th Cir.1987).

Shortly after the California litigation was terminated, FDIC learned that BAICL had, in fact, been conducting business in North Carolina since as far back as 1982. On 20 April 1989, FDIC and Gerald Bass, appointed by this court as receiver pendente lite for FLLIC and FLAC, filed suit against BAICL and its North Carolina subsidiary, British–American Corporation, in this court. Defendants again moved to dismiss for lack of in personam jurisdiction, and on 22 September 1989, the motion was denied, as was defendants' motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Federal Deposit Ins. Corp. v. British–American Corp.*, 726 F.Supp. 622 (E.D.N.C.1989) (hereinafter *"FDIC I"*). By the same order, the court also denied plaintiffs' motion for supplemental proceedings under Rule 69 of the Federal Rules of Civil Procedure.

---

**10.** As noted before, however, BAICL did telex BNZ on 6 May 1983 directing it to transfer all BAICL bank accounts to SWP and to await further instructions from Polland.

1322

On 8 June 1990, the court entered an order striking defendants' defenses of unclean hands and the expiration of the statute of limitations. *Federal Deposit Ins. Corp. v. British–American Corp.*, 744 F.Supp. 116 (E.D.N.C.1990) (hereinafter *"FDIC II"*). Defendants then moved for certification to appeal this ruling to the United States Court of Appeals for the Fourth Circuit under 28 U.S.C. § 1292(b). Finding the certification question "extremely close," and that certification would require a lengthy and unnecessary delay in the ultimate resolution of the case, the court rescinded its 8 June 1990 order insofar as it struck defendants' unclean hands defenses. *Id.* at 120–21. On 1 October 1990, plaintiffs and defendants filed the pending motions for summary judgment.

### III. *Contentions*

Plaintiffs' lawsuit is founded on two theories—fraudulent conveyance and unjust enrichment. They claim that the proposed transfer of BAICL–Fiji to SWP was never consummated and that the $2 million consideration paid to BAICL must be returned. They argue that the transaction could not have been legally consummated without the approval of the Commissioner, who by December 1983 had explicitly disapproved the transfer; thus, they contend, no transfer took place *in law.* Moreover, plaintiffs contend that because no documents were ever executed to effectuate transfer of BAICL–Fiji's assets to SWP, Polland, or anyone else, no transfer took place *in fact.* In addition to the return of the $2 million purchase price, plaintiffs seek 1) prejudgment interest; 2) punitive damages; and 3) attorneys fees.

Defendants' position, first and foremost, is that a proper and legally enforceable transfer was made from BAICL to SWP on 5 May 1983 notwithstanding the Commissioner's lack of approval and the absence of transfer documents. They argue that Fiji law does not render an unapproved transfer a nullity and that Polland and SWP's actual control of the Fiji business and its assets subsequent to 5 May 1983 indicates that a transfer had in fact taken place. Second, they argue that plaintiffs cannot

prevail because of the unclean hands they inherited from those on whose behalf they now act as receivers—namely WNB and FLLIC, both of whom engaged in fraudulent transactions with, or on behalf of, Tripati. Third, defendants contend that the theory of unjust enrichment is not available to plaintiff FDIC, as that theory is not applicable to a plaintiff who has not itself conferred a benefit upon the defendant. Finally, defendants contend that Gerald Bass could not properly have been appointed receiver pendente lite as the corporation on whose behalf he was appointed had no legal existence at the time of his appointment. Thus, they argue, he should not be permitted to recover under any theory.

### IV. *Discussion*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To withstand summary judgment, the non-moving party must establish the existence of a genuine issue of material fact by presenting evidence on which the factfinder could reasonably find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The non-moving party cannot create a genuine issue of material fact by resting on its pleadings. *See Atkinson v. Bass*, 579 F.2d 865, 866 (4th Cir.), *cert. denied*, 439 U.S. 1003, 99 S.Ct. 615, 58 L.Ed.2d 679 (1978).

### A. Defendants' Defenses

#### 1. *Appointment of Receiver Pendente Lite*

On 14 April 1989, prior to instituting this action, plaintiff FDIC moved the court for appointment of a receiver for FLLIC and FLAC pursuant to 28 U.S.C. § 754. The motion was granted and plaintiff Gerald Bass was appointed receiver pendente lite of FLLIC and FLAC. Defendants contend that the court could not, as a matter of law, appoint a receiver for FLLIC and FLAC because, they argue, as of 8 January 1985

these companies were dissolved and liquidated. Thus, they contend, the companies had no legal existence, no capacity to sue or be sued, and no right, title, or interest in property, and, therefore, had no legally cognizable claim to property held by defendants.

Plaintiffs contend that defendants have not produced sufficient evidence to show that FLLIC and FLAC were dissolved, and that even if they had, such dissolution could not impair the right of a judgment creditor to retrieve the assets of the dissolved corporation. As evidence of the dissolution of FLLIC and FLAC, defendants have submitted to the court a letter dated 8 January 1985 from a North Dakota assistant attorney general to the secretary of state of North Dakota informing him of the conclusion of receivership proceedings regarding FLLIC and FLAC and stating that the final order in the matter "did not specifically state that the company [sic] was dissolved, however, a preceding order did so and this was the final order submitted by the court. At this time, the company has been dissolved." Also submitted was a North Dakota state court order of 2 January 1985 terminating the proceedings against FLLIC and FLAC, a letter dated 25 July 1984 from North Dakota's insurance commissioner to its secretary of state informing him that "[b]oth of the companies have been placed in receivership and are being dissolved[,]" and an unsigned North Dakota state court order dated 4 June 1984 which in no manner states that the companies are dissolved.

 Under North Dakota law, a corporation may be dissolved by 1) the issuance of a certificate of dissolution by the secretary of state, 2) a court order of dissolution, or 3) expiration of the duration of corporate existence set forth in the corporate charter. N.D.Cent.Code § 10–21–24. The evidence submitted by defendants does not constitute proof of dissolution. A letter from an assistant attorney general to the secretary of state stating that the defunct company is dissolved is not itself a certificate of dissolution by the secretary of state. Neither of the court orders submitted state

that FLLIC and FLAC, are, were, or have ever been dissolved, and even if the unsigned order did, the court, for obvious reasons, could not rely on it as evidence. Defendants made no effort to prove dissolution via the third method outlined in the statute. Thus, the premise of defendants' argument that plaintiff Bass could not properly have been appointed receiver— that the corporation at the time had no legal existence—is invalid. The motion for summary judgment against Gerald Bass on the ground that he was improperly appointed receiver pendente lite is therefore without merit.

### 2. Unclean Hands

By order dated 8 June 1990, this court struck defendants' unclean hands defenses. *FDIC II*, 744 F.Supp. 116. With respect to Gerald Bass as receiver pendente lite of FLLIC, the court held that because defendants had no dealings whatsoever with FLLIC, the doctrine of unclean hands could not, as a matter of law, be applied against FLLIC's receiver. *Id.* at 118. With respect to FDIC as receiver for WNB, the court held that 12 U.S.C. § 1823(e) prevents defendants from asserting the unclean hands defense. *Id.* at 118–19. Although the court later rescinded its 8 June 1990 order, *id.* at 120–21, it did so solely in the interest of preventing "a lengthy delay in the trial and in the ultimate resolution of this case." *Id.* at 120. The court remains convinced that its order striking the unclean hands defenses was correct and therefore holds that, for the reasons stated more fully in that order, the doctrine of unclean hands does not apply to either plaintiff.

### B. Plaintiffs' Claims

### 1. Unjust Enrichment

In Count Three of the amended complaint, plaintiffs rely on a theory of unjust enrichment to recover the $2 million purchase price of BAICL–Fiji. Defendants have moved for summary judgment on FDIC's claim for unjust enrichment arguing that any cause of action for unjust enrichment belongs solely to the entity who

transferred the disputed property to the defendant—in this case, FLLIC. Defendants contend that as a mere judgment creditor of FLLIC, FDIC lacks standing to pursue this claim.

■ To prevail on a theory of unjust enrichment, plaintiff must show 1) a benefit conferred on the defendant by the plaintiff; 2) acceptance of the benefit by the defendant; and 3) circumstances which make it inequitable for the defendant to retain the benefit. *Cargill, Inc. v. Stafford*, 553 F.2d 1222, 1224 (10th Cir.1977); *Scanwell Laboratories, Inc. v. Thomas*, 521 F.2d 941, 949 (D.C.Cir.1975), *cert. denied*, 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976). The principle of unjust enrichment "is to deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received these benefits quite honestly in the first instance...." D. Dobbs, *Remedies* § 4.1, at 224 (1973). The remedy for unjust enrichment is restitution to the plaintiff of the property which it would be unjust for the defendant to retain. *Id.* § 4.1. "It is usually necessary for the plaintiff to show that *he* conferred the benefit to the defendant." *Scanwell*, 521 F.2d at 950 (emphasis added). If the plaintiff "did not perform any services for, convey any rights to, or confer any benefit on" the defendant, plaintiff ordinarily cannot recover under a theory of unjust enrichment. *Cargill*, 553 F.2d at 1224.

■ Plaintiff FDIC does not contend that either it or WNB, on whose behalf it acts as receiver, conveyed the $2 million purchase price to BAICL. The fact is that the $2 million was conveyed solely by FLLIC. Further, FDIC cites no cases supporting the proposition that, via its status as judgment creditor, it may step into the shoes of the judgment debtor to pursue the debtor's valid claim of unjust enrichment. Rather, it cites *Scanwell*, the same case relied on by defendants, for the proposition that "[w]hile the remedy is sometimes applied when the plaintiff is not the person conferring the benefit on the defendant, as where a stranger augments the defendant's goods with those of the plaintiff ...

it is usually necessary for the plaintiff to show that he conferred the benefit." 521 F.2d at 949–50 (citation omitted). The exception noted therein, however, is not applicable here, as there is no evidence that WNB "augmented" the $2 million conveyed by FLLIC to BAICL. All FDIC can credibly argue is that the $2 million originated from one or more of the three banks (including WNB) controlled by Tripati. As Tripati commingled the funds acquired through his corporate annuities scheme in various bank accounts, it is impossible for plaintiff to prove that any part of the $2 million came from WNB. The court finds, therefore, that FDIC lacks standing to pursue an unjust enrichment claim and that defendants are therefore entitled to judgment against FDIC on Count Three as a matter of law.

■ With respect to plaintiff Bass, however, the claim of unjust enrichment is entirely appropriate. Bass, as receiver pendente lite of FLLIC, stands in its shoes. FLLIC is the entity that conveyed $2 million to BAICL in exchange for the conveyance of the assets of BAICL–Fiji to SWP. BAICL accepted, and continues to retain, the $2 million purchase price. Plaintiff Bass is therefore entitled to restitution of the $2 million if it would be unjust, under the circumstances, for BAICL to retain it. *Cargill*, 553 F.2d at 1224; *Scanwell*, 521 F.2d at 949. As will be explained more fully in the next section of this opinion, as a matter of law, it would be unjust for BAICL to retain the $2 million purchase price, for neither FLLIC, nor anyone associated with FLLIC, received anything at all in exchange for these funds. Thus, plaintiff Bass is entitled to judgment as a matter of law on his claim for unjust enrichment.

### 2. Fraudulent Conveyance
#### a. Choice of Law

■ Upon invitation from the court, the parties have briefed the issue of what law applies to Count Two of the amended complaint, plaintiffs' fraudulent conveyance claim. Additionally, the parties have filed supplemental memoranda addressing the

application of the Crime Control Act of 1990, which was enacted on 29 November 1990, to the facts of this case. Among the titles included in the Act is Title XXXVI, "The Federal Debt Collection Procedures Act of 1990." Section 3631 of that title provides that it does not take effect until 180 days after its enactment—28 May 1991. Thus, technically, the Act may not be applied to this case. Nonetheless, plaintiffs argue that the procedures and substantive provisions contained in the Act should be accepted as an indicator of the existing federal common law, and therefore the Act may properly be consulted in resolving this case. The court rejects this argument as illogical, for if Congress, through the Act, was merely codifying existing federal common law, there is no rational explanation for it having made the effective date 180 days from enactment, as opposed to upon enactment. Thus, the court will disregard the Act entirely.

 Defendants contend that Fiji law should be applied to Count Two. This contention is based on paragraph 20 of the 5 May 1983 agreement which stated: *"Controlling Law.* This Agreement shall be construed, interpreted and governed by and under the laws of Fiji." Defendants' contention is without merit. A contractual choice-of-law provision selecting the law to govern the construction or interpretation of the contract has no impact on the law which governs claims unrelated to the construction or interpretation of the contract. *Glaesner v. Beck/Arnley Corp.,* 790 F.2d 384, 386 n. 1 (4th Cir.1986); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 50 n. 11 (4th Cir.1983), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). Plaintiffs' fraudulent conveyance claim is not founded on the construction or interpretation of the contract, but rather, on whether the contract could have, by itself, caused a legal transfer of BAICL–Fiji to SWP or Polland. Thus, the choice-of-law provision is irrelevant.

 Having concluded that it would not be appropriate to apply Fiji law, the court concludes that federal common law, as opposed to the law of a particular state, applies. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979).[11] The question then arises, what is the federal common law of fraudulent conveyance? Plaintiffs contend that the Uniform Fraudulent Conveyance Act ("UFCA") should be applied as the federal common law. Defendants argue that the common law of fraudulent conveyance, and not UFCA, should apply.

The court is convinced that plaintiffs' position is the better one. The use of a uniform statute as federal common law is often appropriate. *See, e.g., Everett Plywood & Door Corp. v. United States,* 419 F.2d 425, 429–30 (Ct.Cl.1969); *United States v. Wegematic Corp.,* 360 F.2d 674, 676 (2d Cir.1966). UFCA has been applied as federal common law. *See United States v. Neidorf,* 522 F.2d 916 (9th Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); *United States v. Johnston,* 245 F.Supp. 433, 443 (W.D.Ark.1965). Moreover, at the time of the conveyance at issue, 5 May 1983, UFCA had been enacted in 24 states, including three of the four most involved in the conveyance—California, North Dakota, and Wyoming. Thus, the court will apply UFCA to the facts.

### b. Application of Law to Facts

Section 4 of UFCA provides:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to its creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

UFCA § 4, 7A U.L.A. 430 (1985 & 1990 Cum.Supp.). Section 9 of UFCA provides, in pertinent part:

(1) Where a conveyance or obligation is fraudulent as to a creditor, such creditor ... may, as against any person except a purchaser for fair consideration

---

**11.** Congress' recent enactment of a federal statute on fraudulent conveyances convinces the court that the *Kimbell Foods* criteria for application of federal common law are satisfied.

without knowledge of the fraud at the time of the purchase ...

 (a) Have the conveyance set aside ... or

 (b) Disregard the conveyance and attach or levy execution upon the property conveyed.

*Id.* § 9. Thus, if the conveyance from FLLIC to BAICL of $2 million was not supported by fair consideration and FLLIC was then, or thereby made, insolvent, FLLIC's creditors—FDIC foremost among them—would be entitled to set the conveyance aside.

#### (1) Fair Consideration

■ UFCA defines "fair consideration" as "a fair equivalent therefor...." *Id.* § 3(a). The critical question, then, is did FLLIC, Polland, or SWP receive a fair equivalent for the $2 million they conveyed to BAICL? If they received the assets of the BAICL–Fiji branch in return, then the answer is "yes," as it appears from the record that the assets were then worth between $1 million and $3 million. The court concludes, however, that the assets of BAICL–Fiji were never transferred to FLLIC, Polland, or SWP.

First, BAICL could not legally transfer BAICL–Fiji without the approval of the Commissioner. Section 52 of the Fiji Insurance Act provides in pertinent part: "The Commissioner [upon application of the directors of the transferor or transferee] ... may approve the proposed transfer if he is satisfied that no sufficient objection thereto has been or can in his opinion be established." Insurance Act of 1976 § 51, Laws of Fiji (No. 36 of 1976). On 7 December 1983, the Commissioner explicitly disapproved the transfer. Although section 73 of the Fiji Insurance Act allows an aggrieved party to appeal an adverse decision of the Commissioner, *id.* § 73, neither BAICL nor SWP did so. Thus, under Fiji law, which, according to section 20 of the 5 May 1983 agreement, governed the agreement, the transfer never occurred.

Second, under the express terms of section 10 of the agreement, approval of the transfer by the Commissioner was a contractual condition precedent to the transfer:

> The transfers contemplated by this Agreement and all the obligations of the Seller as set forth herein *shall at all times be subject to and contingent upon the obtaining, by Polland, of all government approvals in the Dominion of Fiji* and elsewhere as may be necessary to insure the legality and propriety of such sale and transfer.

(Emphasis added.) "Conditions precedent ... are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available." 3A A. Corbin, *Corbin on Contracts* § 628, at 16 (1960) (footnote omitted). Again, the Commissioner disapproved the transfer. Thus, according to section 10 of the agreement, the attempted transfer was a nullity.

Third, no transfer of BAICL–Fiji occurred *in fact.* Although Polland and SWP temporarily asserted dominion over BAICL–Fiji, no documents were ever executed which actually transferred possession of BAICL–Fiji's assets. The 5 May 1983 agreement was merely a contract of sale; it could not, by its own force, transfer to SWP 1) 35,000 insurance policies; 2) bonds; 3) policyholder loans evidenced by promissory notes; 4) other securities; 5) real estate; and 6) bank accounts. Assignments and deeds were necessary to transfer these items, and they were never executed. BAICL's president, David Thurlow, admitted during his deposition that although he and BAICL fully intended to execute such documents, they never did so "because the process *was never completed the way it was envisioned.*" (Emphasis added.)

In sum, the transfer contemplated in the 5 May 1983 agreement never occurred because 1) the Fiji Commissioner explicitly disapproved it; 2) a contractual condition precedent to the transfer—government approval—was never fulfilled; and 3) none of the assets were ever actually conveyed. In short, not only was fair consideration not

given for the $2 million purchase price received by BAICL, *no consideration was given.*

Defendants' primary argument in response to plaintiffs' fraudulent conveyance claim is that

[a]lthough the contract of sale may have been voidable by BAICL at its election as a result of Polland's breaches of warranty, if it instead elected to retain the purchase price and part with its bank accounts, investments, and financial obligations due it, plaintiffs have made no showing that the contract itself was inadequate to pass title to those assets to the purchaser or that any additional written document or assignment was required.

Defendants also argue that section 52 of the Fiji Insurance Act does not render an unapproved transfer a nullity. Defendants point out that whereas the insurance laws of Bermuda, Singapore, and Malaysia declare an unapproved transfer a nullity, section 52 of the Fiji Act contains no such language.

The court finds both arguments untenable. Dominion and ownership are two entirely distinct legal concepts. One of the most important rights incident to ownership, but not incident to dominion, is alienability. No matter how hard SWP tried, it could not legally transfer to another party BAICL–Fiji's bonds, securities, land, and insurance policies; nor could it legally withdraw money from or write checks on BAICL bank accounts. Although defendants contend that SWP "exercised dominion" over BAICL–Fiji bank accounts of approximately $435,000, no evidence was presented to the court that the balance in those accounts has been depleted by the actions of SWP.

Even if a contract of sale could somehow pass title to assets such as land, bonds, securities, insurance policies, and bank accounts, the 5 May 1983 agreement could not do so. The Commissioner's explicit disapproval of the transfer *rendered the transfer a nullity.* Section 52 of the Fiji Insurance Act could not be clearer—the Commissioner's approval is a prerequisite to a valid transfer. Defendants ask this

court to believe that, notwithstanding section 52, a valid transfer can be consummated without such approval. Such a construction *renders section 52 a nullity,* and this court has no power to nullify Fiji law. Furthermore, defendants' argument ignores the express condition precedent to the agreement, which made "[t]he transfers ... subject to and contingent upon the obtaining ... of all government approvals ... necessary to insure the legality and propriety of such sale and transfer." How the transfer could have occurred without such approvals escapes the court.

Defendants' fall-back argument is that fair consideration was given because "[a]n enforceable promise, made at the time of the transfer of the property, is sufficient consideration, if the thing promised is not disproportionate to the value of the thing received." 37 C.J.S. *Fraudulent Conveyances* § 146. This argument misses the point: the 5 May 1983 sales agreement never became enforceable because both a legal condition precedent and a contractual condition precedent were never fulfilled. *See* 5A A. Corbin, *Corbin on Contracts* § 1194 (1964). At all relevant times, therefore, the agreement was unenforceable, and unenforceable agreements do not provide fair consideration for the transfer of property.

### (2) Solvency of FLLIC

Under section 2 of UFCA, "[a] person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." UFCA § 2(1). If the plaintiff establishes that the transferor did not receive fair consideration and that the transferor was in debt at the time of the transfer, the burden of proving solvency shifts to the transferee. *Lacey v. Van Royen,* 259 Md. 80, 93, 267 A.2d 91, 97 (1970). As explained above, fair consideration was not given to the transferor. Moreover, the evidence in the record compels the conclusion that on 5 May 1983, FLLIC was a debtor, fraudulent annuities having been issued to WNB as early as 14 March 1983. Thus, defendants

have the burden of proving that FLLIC was solvent at the time the agreement was executed.

Defendants have failed, as a matter of law, to establish FLLIC's solvency as of 5 May 1983. Their expert, Stephen G. Farrar, testified at deposition that he could not determine whether FLLIC was solvent or insolvent as of that date. In contrast, Paul Spellman, Fort Lincoln's CPA in April and May of 1983, testified that in his opinion, based on his work on the actual books and records of FLLIC, the company was insolvent as of May 1983. Plaintiffs' expert, Dr. Joseph Johnson, also testified that, in his opinion, FLLIC was insolvent on 5 May 1983.

Having found as a matter of law that 1) BAICL did not give fair consideration for the $2 million it received on 5 May 1983, and that 2) FLLIC, the actual transferor, was insolvent on that date, the court concludes that plaintiffs are entitled to judgment as a matter of law on Count Two of their amended complaint.

### 3. Prejudgment Interest

■■■■ Where the underlying claim is contractual in nature and damages are liquidated, the long-standing rule is that a party who has wrongfully withheld money from another must pay prejudgment interest. *West Virginia v. United States*, 479 U.S. 305, 310–11, 107 S.Ct. 702, 706–07, 93 L.Ed.2d 639 (1987); *Miller v. Robertson*, 266 U.S. 243, 257, 45 S.Ct. 73, 78, 69 L.Ed. 265 (1924); D. Dobbs, *Remedies* § 3.5, at 166 (1973). Defendants concede in their response memorandum that a claim of fraudulent conveyance is quasi-contractual. Defendants argue, however, that since the fraud here was constructive, rather than actual, it would not be fair to penalize defendants, who had no knowledge of the fraudulent intent of the transferor, by awarding prejudgment interest. The court is somewhat bewildered by this response. Having concluded that the $2 million acquired by BAICL on 5 May 1983 may not, as a matter of law, be retained by defendants, how could it possibly be correct, consistent, or equitable for the court to

allow defendants to keep the $1.7 million which has accrued in interest over the last eight years? Awarding prejudgment interest in this case does not penalize defendants, but rather puts each party in the same position it would now be in had the fraudulent transfer never occurred. As a matter of law, plaintiffs are entitled to prejudgment interest.

■■■■ There is no federal statute setting the rate of prejudgment interest in cases arising under federal law. The rate of prejudgment interest is generally within the discretion of the district court. *United States v. Dollar Rent A Car Systems, Inc.*, 712 F.2d 938, 940 (4th Cir.1983). The court has decided to employ the federal post-judgment interest statute, 28 U.S.C. § 1961, to determine the prejudgment rate to apply to this case. Other courts have done likewise. *See, e.g., Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1029 (5th Cir.1986); *Western Pacific Fisheries, Inc. v. S.S. President Grant*, 730 F.2d 1280, 1289 (9th Cir.1984). The post-judgment rate is "a rate equal to the coupon issue yield equivalent ... of the average accepted auction price for the last auction of fifty-two week United States Treasury bills...." 28 U.S.C. § 1961(a). Interest "shall be compounded annually." *Id.* § 1961(b). Thus, in calculating the prejudgment interest to be awarded in this case, the court applied to the $2 million principal the average statutory rate for every one-year period between the 5 May 1983 transaction date and the present, and compounded the interest annually. These computations result in an award of prejudgment interest of $1,693,690.58.[12]

### 4. Punitive Damages

In their amended complaint, plaintiffs prayed for an award of punitive damages against defendants. As grounds for such award, plaintiffs cite 1) the declarations filed by Woodson and Ragsdale in the California litigation contending that BAICL conducted no business in the United States—a contention later proven untrue, *see FDIC I*, 726 F.Supp. 622; 2) the declaration filed by Ragsdale in the California litigation stating that Polland told him be-

---

12. See Appendix for computations.

fore the agreement was executed that the Fiji government had approved the transfer, which plaintiffs contend has now been proven false; and 3) the attempt of BAICL in the current litigation to have attached North Carolina assets released just three weeks after arguing to the court that it owned no assets in North Carolina. Defendants contend that punitive damages may not be recovered in equity as a matter of law.

Plaintiffs correctly observe that the jurisdictions which have considered the question whether punitive damages are available in equity are split fairly evenly. *See* Annotation, *Punitive Damages: Power of Equity Court to Award,* 58 A.L.R. 4th 844 (1987 & 1990 Supp.). Plaintiffs contend that the modern trend is to allow punitive damages in equitable suits. Defendants contend that the majority rule is still that which prohibits an award of punitive damages in equity. A critical question left unaddressed by all parties, however, is, irrespective of the majority rule and the modern trend, whose law should apply to this case—federal common law or state law, and if state law, the law of which state?

▄▄▄ The court will leave this difficult question for another day, for it is convinced that even if the applicable law permits the court to award punitive damages in this case, as a matter of law, there is no basis for doing so. The grounds cited by plaintiffs and listed above which they contend warrant the imposition of punitive damages are insufficient as a matter of law. Punitive damages are available when the *underlying conduct on which the lawsuit is premised* is willful, wanton, egregious, or the like. *See, e.g., Commerzanstalt v. Telewide Systems, Inc.,* 880 F.2d 642, 649 (2d Cir.1989). They are not intended to redress misconduct occurring during the litigation process. Such misconduct is properly redressed through the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 11.

Even if plaintiffs had argued that the conduct exhibited by defendants incident to the underlying transaction was sufficiently egregious to warrant the imposition of punitive damages, the court would still have declined to impose such damages. There is simply no competent evidence in the voluminous record that BAICL knew, on 5 May 1983, that it was entering into a fraudulent transaction with Polland. Although the transaction could not be consummated according to Fiji law, this by no means implies that defendants had a malicious purpose for entering into it. Further, there is no evidence in the record that BAICL knew of Tripati's involvement until well after the agreement had been executed. Although it perhaps would have been wiser for BAICL to have tried to undo the transaction as the agreement permitted and its senior vice president Phillips suggested, its failure to invoke this provision cannot be considered malevolent. In short, at most BAICL was guilty of greed and poor business judgment; there is no basis upon which this court can impose punitive damages.

### 5. Attorneys Fees

Plaintiffs contend that they are entitled to recover attorneys fees as a matter of law. In *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975) the Supreme Court, in refusing to alter the long-standing "American rule," observed that "[i]n the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." Generally, only if Congress has statutorily authorized an award of attorneys fees may they be granted to the prevailing party. *Id.* at 269, 95 S.Ct. at 1627. Nonetheless, "federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require." *Hall v. Cole,* 412 U.S. 1, 4–5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973). "[I]t is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* (quoting 6 J. Moore, *Federal Practice* Par. 54.77[2], at 1709 (2d. ed. 1972)).

Defendants, of course, deny any bad faith, vexatiousness, or wantonness in their defense of this lawsuit. Moreover, they correctly state that it is ordinarily not possible to resolve such issues on a motion for summary judgment. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 2730 (1983). On the

record before it, the court is unable to rule that defendants have acted in bad faith as a matter of law. If plaintiffs so desire, they may file a written motion for an award of attorneys fees and the matter will be set for an evidentiary hearing.

### V. *Conclusion*

For the foregoing reasons, defendants' motion for summary judgment on plaintiff FDIC's unjust enrichment claim and on both plaintiffs' demand for punitive damages is hereby GRANTED. Plaintiff Bass' motion for summary judgment on his unjust enrichment claim is hereby GRANTED. Plaintiffs' motion for summary judgment on their fraudulent conveyance claim is also hereby GRANTED. The clerk is directed to enter judgment in favor of plaintiffs in the amount of $3,693,690.58, with interest thereon from date at the rate of 6.62% per annum until paid.

### APPENDIX

| | |
|---|---:|
| Starting principal | $2,000,000.00 |
| Average interest rate ("AIR") 5 May 1983–5 May 1984 = 140.12% (sum of 14 applicable rates)/14 = 10.008%; 10.008% × $2,000,000 | 200,160.00 |
| New principal | 2,200,160.00 |
| AIR 5 May 1984–5 May 1985 = 148.47%/14 = 10.605% | 233,326.97 |
| New principal | 2,433,486.97 |
| AIR 5 May 1985–5 May 1986 = 109.43%/14 = 7.816% | 190,201.34 |
| New principal | 2,623,688.31 |
| AIR 5 May 1986–5 May 1987 = 85.48%/14 = 6.105% | 160,176.17 |
| New principal | 2,783,864.48 |
| AIR 5 May 1987–5 May 1988 = 97.54%/14 = 6.967% | 193,951.84 |
| New principal | 2,977,816.32 |
| AIR 5 May 1988–5 May 1989 = 119.11%/14 = 8.507% | 253,322.83 |
| New principal | 3,231,139.15 |
| AIR 5 May 1989–5 May 1990 = 114.71%/14 = 8.193% | 264,727.23 |
| New principal | 3,495,866.38 |
| AIR 5 May 1990–28 January 1991 = 77.07%/10 = 7.707%; 7.707% × $3,495,866.38 = $269,426.42; $269,426.42/365 = $738.15/day; $738.15/day × 268 days | 197,824.20 |
| Current principal | $3,693,690.58 |
| Starting principal | 2,000,000.00 |
| Prejudgment interest | $1,693,690.58 |